DA 11-0537

IN THE SUPREME COURT OF THE STATE OF MONTANA

2012 MT 128

MONTANA WILDLIFE FEDERATION,
NATIONAL WILDLIFE FEDERATION,

      Plaintiffs and Appellants,

  v.

MONTANA BOARD OF OIL & GAS CONSERVATION,

      Defendant and Appellee,

  and

FIDELITY EXPLORATION & PRODUCTION COMPANY,

      Defendant-Intervenor and Appellee,

  and

MONTANA PETROLEUM ASSOCIATION,

      Defendant-Intervenor and Appellee.

APPEAL FROM:    District Court of the Sixteenth Judicial District,
                  In and For the County of Fallon, Cause No. DV 08-34
                  Honorable Joe L. Hegel, Presiding Judge

COUNSEL OF RECORD:

      For Appellants:

            David K. W. Wilson, Jr. (argued); Morrison, Motl, and Sherwood, PLLP;
            Helena, Montana

      For Appellee:

            Norman C. Peterson (argued), Agency Legal Services; Helena, Montana
            (Montana Board of Oil & Gas Conservation)

Dana L. Hupp (argued), Gough, Shanahan, Johnson, & Waterman, PLLP; Helena, Montana
(Fidelity Exploration & Production Company)

Steven J. Lechner (argued), Mountain States Legal Foundation; Lakewood, Colorado (Montana Petroleum Association)

Steven W. Jennings, Colby L. Branch; Crowley Fleck; Billings, Montana (Montana Petroleum Association)

Argued:     April 4, 2012
Submitted:  April 11, 2012
Decided:    June 19, 2012

Filed:

_____
                    Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1 The Montana Wildlife Federation (MWF) and National Wildlife Federation (NWF) (collectively "Federations") appeal the Sixteenth Judicial District Court's order granting summary judgment to defendants Montana Board of Oil & Gas Conservation (Board or MBOGC), Fidelity Exploration and Production Company (Fidelity), and Montana Petroleum Association (MPA) (collectively "Appellees"). We affirm the District Court's grant of summary judgment. We consider three issues on appeal:

¶2 *1. Whether the District Court erred in conducting its review under § 82-11-144, MCA, and in considering evidence that was not part of the administrative record.*

¶3 *2. Whether the District Court erred in determining that twenty-three individual environmental assessments prepared by the Board for gas development in the Cedar Creek Anticline were adequate under the Montana Environmental Policy Act.*

¶4 *3. Whether the District Court erred in ruling that MBOGC did not have to prepare a programmatic environmental impact statement for oil and gas development in the Cedar Creek Anticline area.*

## INTRODUCTION

¶5 At issue is the MBOGC's issuance of twenty-three gas well permits to Fidelity in the area known as the Cedar Creek Anticline (CCA), a major geologic feature that extends for nearly 120 miles, from Glendive, Montana at the north, through Baker, Montana, and into North Dakota. Its southern end is in South Dakota. The CCA is the largest oil and gas producing structural geologic feature in Montana. Natural gas exploration began in the CCA area in 1912, and significant gas development occurred between 1914 and 1920. Oil was discovered in the CCA in January of 1952. The CCA hosts a large industrial complex containing both surface and sub-surface infrastructure

3

associated with natural resource development including oil and gas drilling, windmills, and an underground gas storage reservoir. Within the CCA are the Cedar Creek Gas Field and the Cedar Creek Oil Field. Fields in parts of Fallon, Wibaux, Prairie, and Dawson Counties produce oil and gas from the CCA. The Cedar Creek Gas Field is in the highest elevation of the CCA and is approximately three to five miles wide. As of 2008, there were 1100 wells drilled in the Cedar Creek Gas Field. At the time the Federations filed suit, Fidelity operated 926 gas wells in the field, holding leases to approximately 62,256 acres of land.

¶6    The MBOGC was established in 1953 with the passage of the Montana Oil and Gas Conservation Act. The MBOGC has broad authority over the issuance of permits to drill for and the regulation of oil and gas. Section 82-11-111, MCA. On August 7, 2008, Fidelity submitted applications for permits to drill twelve natural gas wells in the Cedar Creek Gas Field. On October 29, 2008, Fidelity submitted applications for permits for eleven additional natural gas wells in the field. The MBOGC prepared environmental assessments for each application and issued Fidelity permits to drill twenty-three new natural gas wells. Due to the nature of the gas wells, only infrequent site visits and limited infrastructure are required. Namely, there is no need for water, improved roads, or electric motors. As a general rule, oil wells require more monitoring and infrastructure than do the type of gas wells at issue.

¶7    The CCA also is home to various animal species, notably here, the sage grouse. Sage grouse depend on sagebrush to feed, breed, nest, and live. When sagebrush is

4

destroyed by human activity such as the construction of roads and power lines, conversion of land to tillage agriculture, or is replaced with other grass to improve range forage for livestock, sage grouse lose critical habitat. It is estimated that approximately fifty percent of the sagebrush in the United States has been destroyed or lost. The Court takes judicial notice, pursuant to M. R. Evid. 201, that the U.S. Fish and Wildlife Service announced in March 2010 its finding that rangewide listing of the greater sage grouse as a threatened or endangered species is warranted, but precluded by higher priority listing actions. 75 Fed. Reg. 13910 (March 23, 2010). The sage grouse maintain a number of breeding grounds (called "leks") on the CCA. Federations' expert opined that eight of the proposed twenty-three wells are within two miles of an existing lek. Federations challenge the issuance of the permits on the premise that the environmental assessments underlying them did not adequately assess the potential impacts to the sage grouse and their breeding grounds. They also assert that MBOGC should be required to conduct a programmatic evaluation of the environmental impacts of gas well drilling in the CCA.

## PROCEDURAL AND FACTUAL BACKGROUND

### *Role of the MBOGC and Other Agencies*

¶8     The MBOGC and other state and federal agencies play various roles in the protection and management of natural resources, compliance with environmental laws, and the issuance of drilling permits. The MBOGC has regulatory control over the drilling of oil and gas wells and is authorized to take measures to prevent waste of oil and gas resources, to prevent contamination of or damage to surrounding land or underground

5

strata, and to promote environmentally sound development of oil and gas in Montana. Section 82-11-111, MCA. In the exercise of its jurisdiction over oil and gas wells on private/fee and State owned lands, § 82-11-103, MCA, the Board is required to comply with the Montana Environmental Policy Act (MEPA). Section 75-1-101, et seq., MCA; Admin. R. M. 36.2.524 (MEPA requires that "the agency shall determine the significance of impacts associated with the proposed action.").

¶9 The federal Bureau of Land Management (BLM), part of the Department of the Interior, carries out a variety of programs for the management and conservation of federally owned land and resources. BLM's role in oil and gas development is limited: it is responsible for ensuring that the federal mineral resource is conserved and developed in a safe and environmentally sound manner. The BLM has no state-level equivalent. The duties undertaken by BLM at the federal level are split among various agencies in Montana: the Department of Natural Resources and Conservation (DNRC), the Department of Environmental Quality (DEQ), Montana Fish, Wildlife, and Parks (FWP), and the State Historical Preservation Office. The MBOGC has a more limited range of responsibilities in evaluating environmental impacts than does the BLM. In particular, the MBOGC relies on other agencies with applicable expertise in complying with MEPA. MBOGC consults with and relies on FWP for information regarding the conservation and management of wildlife and recreation resources in Montana.

¶10 Before any environmental assessments were conducted in connection with the wells at issue in this case, state and federal agencies prepared two major environmental

6

reviews pertaining to oil and gas development in the area of the CCA. As explained below, these reviews were critical to the Board's decision to issue permits for natural gas wells and provide the foundation for its review of hundreds of permit applications annually. The parties stipulated to admission in the District Court of the underlying Administrative Record in this case, which includes, in part, the two reviews. The Administrative Record is composed of: the Draft Programmatic Environmental Impact Statement—Oil and Gas Drilling Production in Montana (1989); the Technical Appendix to the Draft; the Final Programmatic Environmental Impact Statement (EIS)—Oil and Gas Drilling and Production in Montana (1989); Montana Final Statewide Oil and Gas EIS and Proposed Amendment to the Powder River and Billings Resource Management Plans (2003); MBOGC's Record of Decision related to the EIS; MBOGC Orders related to the Cedar Creek Gas Field and Fidelity's 2003 Application for an Order increasing Well Density; documentation contained in the Well Files for the wells associated with the environmental assessments challenged by Federations; documentation contained in the Well Log Files for the wells being challenged; Well Production reports for the wells being challenged; and five different articles of scientific research on sage grouse populations and energy development. The following discussion comes from information contained in the Administrative Record, except as otherwise noted.

### The 1989 PEIS

¶11    In 1989, the MBOGC undertook to prepare a Programmatic Environmental Impact Statement on Oil and Gas Drilling Production in Montana (1989 PEIS), the goal of which

was to establish "a quick and efficient method for [MBOGC] to follow in integrating [MEPA] into its decision making." The Board was required to prepare the programmatic statement pursuant to the 1987 Legislature's Senate Bill 184 (1987 Mont. Laws ch. 473), which granted the Board a two-year exemption from the requirements of MEPA ending on June 30, 1989. In January of 1989, the MBOGC, along with the DNRC, released a draft PEIS for public comment. The 1989 Montana legislature passed Senate Bill 201, which authorized MBOGC to complete the PEIS and adopt a process to review drill permits in compliance with MEPA. 1989 Mont. Laws ch. 566. The 1989 PEIS presented various alternatives for addressing environmental reviews from which the Board adopted a review process for permitting wells. The draft 1989 PEIS concluded that for the vast majority of wells, the only documentation necessary to show compliance with MEPA is a brief checklist Environmental Assessment (EA) prepared by MBOGC staff. The draft version of the 1989 PEIS analyzes areas with low to moderate impact potential for wildlife, including a discussion on the impacts to sage grouse from oil and gas activity, particularly the birds' susceptibility to disturbance during strutting season. The final 1989 PEIS summarized and updated the draft, and was released in December 1989.

¶12 The 1989 PEIS sets forth the steps the MBOGC must fulfill to complete a Level 1 MEPA review. Over the Federations' objection, the District Court admitted the affidavit of Tom Richmond, Division Administrator for MBOGC. Richmond's affidavit states that, under a Level 1 Review, "it is assumed that accurate information about both the surface and sub-surface is readily available for a proposed drilling operation, and that no

8

unusual circumstances would raise questions about its ability to comply with applicable MBOGC rules." For Level 1 review, the final 1989 PEIS articulated the following steps: a desk review of data submitted by the operator or collected by the MBOGC, preparation of an environmental checklist, and attachment of special permit conditions to address environmental concerns. The 1989 PEIS included an example of a checklist for MBOGC to use in evaluating the impacts associated with drilling. The form utilized by MBOGC for the twenty-three wells in question mirrors this example and consists of a series of requests for information and decisions about each well. Each checklist EA has ten categories for review: (1) Operator and Well Location; (2) Air Quality; (3) Water Quality; (4) Soils/Vegetation/Land Use; (5) Health Hazards/Noise; (6) Wildlife/Recreation; (7) Historical/Cultural/Paleontological; (8) Social/Economic; (9) Remarks or Special Concerns for the Site; (10) Summary: Evaluation of Impacts and Cumulative Effects.

### *The 2003 FEIS*

¶13    In 1999, MBOGC, along with the DEQ and the BLM, began work on a new programmatic environmental impact statement (2003 FEIS) to analyze and disclose reasonably anticipated impacts from coalbed natural gas (CBNG) development in Montana. The 2003 FEIS determined that CBNG wells were not likely to be economical if drilled and produced on a single well basis, and that, because of the need for installation of significant water-handling infrastructure, project level permitting was likely necessary for CBNG production. This case does not involve CBNG wells.

According to Richmond, however, "while the 2003 FEIS focused on the potential impacts of CBNG exploration and production throughout the state, the effects of anticipated conventional oil and gas development were also analyzed." However, the planning area in the 2003 FEIS did not include Fallon, Wibaux, Prairie, and Dawson Counties, those counties producing the oil and gas from the CCA. Instead, the counties assessed were the adjacent Custer and Carter Counties, along with Blaine, Gallatin, Park, Wheatland, Golden Valley, Musselshell, Sweet Grass, Stillwater, Carbon, Yellowstone, Big Horn, Treasure, Powder River, and Rosebud Counties.

¶14   The permitting process developed in connection with the 1989 PEIS was reviewed by MBOGC when it, along with the other agencies, prepared the 2003 FEIS. Richmond noted during his deposition (not part of the administrative record), that "what the 2003 EIS did allow us to do was to review the new information and make a refreshed decision about our permitting process on conventional oil and gas." He further explained:

> The 2003 EIS, because it has an emphasis on coalbed, required us to look at how we would permit coalbed methane and the decision that we made is that we would permit it on a project level basis rather than an individual well basis . . . So the process of making that decision caused us to look at how we do individual well permits for conventional oil and gas and we decided at that time not to change that process and try and incorporate a greater degree of project level permitting.

The 2003 FEIS had a much greater depth of analysis than the 1989 PEIS because the 2003 FEIS reviewed land management generally, and not just oil and gas regulation. Significantly, however, MBOGC "left the individual well permit process in place for conventional oil and gas wells." The 2003 FEIS included a review of impacts to wildlife,

10

including sage grouse, and considered the impacts of both CBNG development and conventional oil and gas development. The 2003 FEIS also explicitly noted that it "may be tiered from or incorporate by reference other documents" including the 1989 PEIS. The MBOGC has not performed any other programmatic evaluation specific to oil and gas development in the CCA.

### *The Completion of Environmental Assessments and Issuance of Permits*

¶15   Steven Sasaki is the Chief Field Inspector for MBOGC and was responsible for gathering information for, assessing, and performing the environmental assessments for the twenty-three permits at issue in this case. In so doing, he utilized the checklist form developed as part of the 1989 PEIS. Sasaki has been an employee of the MBOGC for twenty-two years and has traveled the length of the CCA, making approximately ten trips to different parts of the CCA in preparing hundreds of environmental assessments for gas wells in the Cedar Creek Gas Field. Sasaki testified by his affidavit, over the Federations' objection, that each assessment required particular information and consideration of the circumstances of each well, along with its cumulative effect.

¶16   Sasaki's affidavit described that prior to completing the assessments, he spoke with a FWP biologist, who directed him to consult the "Montana Heritage Tracker" website (http://mtnhp.org), an extensive database of information on animal and plant species in Montana. The form created in the 1989 PEIS directs that FWP is responsible for identifying "sensitive wildlife areas." The form contains a section for whether there are threatened or endangered species or sensitive habitat in the geographic area subject to

11

the permitting process. Sasaki consulted the Heritage Tracker database and reviewed topographic maps to determine whether the areas in question were close to designated wildlife refuges, national grass lands, national parks, or similar designated areas. Sasaki's affidavit states that he "found there were no threatened or endangered species or sensitive wildlife areas in the proximity of any of the proposed wells, nor were there any state or federally designated sensitive wildlife areas." Following his review of information concerning the area of the newly requested permits, the previously drilled wells and their related infrastructure, Sasaki determined that the addition of twenty-three wells would not create new human access to wildlife habitat or lead to further cumulative impacts.

### The Current Litigation

¶17 Federations brought suit in 2008 following issuance of the twenty-three permits, contending the environmental assessments were inadequate under MEPA. The complaint requested that the District Court (1) declare that the twenty-three EAs are inadequate under MEPA; (2) declare that MBOGC is in violation of MEPA for failing to perform a programmatic review of the oil and gas development in the Cedar Creek Gas Field; and (3) issue an order enjoining MBOGC from further issuing well drilling permits until a programmatic review has been performed under MEPA on the Cedar Creek Gas Field. In particular, Federations argued that "sage grouse are particularly susceptible to the development at issue" and that oil and gas development "results in calculable impacts on breeding populations." The District Court granted Fidelity's motion to intervene as a

defendant on February 6, 2009, and MPA's motion to intervene on April 4, 2009. The parties filed cross-motions for summary judgment. Appellees' motion for summary judgment argued that issuance of the environmental assessments was proper under MEPA and that the MBOGC's approval of infill gas wells was not a major state action necessitating an EIS.

¶18 Following a motion by Appellees, the District Court concluded that § 82-11-144, MCA, applied to the proceedings. It provides in part that for a suit challenging any rule, order or act by the Board, "the suit shall be . . . tried de novo . . . and disposed of as an ordinary civil suit and not upon the record of any hearing before the [MBOGC]." After a period of discovery, the parties submitted additional material to the court, and the agency was permitted to submit affidavits and other matters to supplement the administrative record. The District Court also granted MBOGC's unopposed motion to lodge the MBOGC's Administrative Record (as discussed above) and include it in the record of the court.

¶19 Supplementing their motion for summary judgment, Federations offered the affidavit of James Gore, a wildlife biologist with experience studying sage grouse and other birds. He attested to general knowledge about sage grouse and the impacts that the human population can have on them. In its later order on summary judgment, the District Court concluded that, though Gore is an expert on sage grouse generally, he "is not an expert regarding oil and gas wells and the infrastructure required to support them," nor did he acknowledge the relatively small impact of an infill gas well as opposed to drilling

13

and operating an oil well. Appellees also provided additional information to the court in support of their cross-motion for summary judgment, in the form of affidavits from MBOGC staff, Fidelity employees, and wildlife experts which supported their position that additional impacts on sage grouse would be minimal.

¶20 After reviewing the evidence, the District Court determined it could set aside the MBOGC's permit issuance under § 82-11-144, MCA, if it found the action to be "arbitrary, unreasonable, capricious and [sic] abuse of discretion or otherwise not in accordance with the law." The District Court found that each of the environmental assessments at issue is "tiered" to the 1989 PEIS and the 2003 FEIS, recognizing tiering as "an accepted practice in which an agency relies on and incorporates analysis from a previously prepared environmental document into a subsequent analysis" as a means to eliminate unnecessary repetitive discussions.

¶21 The court concluded that "MBOGC reasonably determined that approval of the infill gas wells in a pre-existing gas field where the infrastructure is almost entirely in place would be a routine action with limited environmental impact" and it was reasonable for the MBOGC to conclude that a checklist environmental assessment, rather than an EIS, was adequate. In granting Appellees' motion for summary judgment, the District Court held that the Federations failed to rebut the presumption of validity in the Board's decision and that the MBOGC had given a "sufficiently hard look" at the potential environmental impact of the proposed wells. This appeal followed.

¶22 Over the course of the litigation, the number of contested wells has been narrowed from the original twenty-three. Federations' expert, Gore, in his affidavit, pointed to the fact that any well located within two miles of active breeding leks could adversely affect those leks. Gore identified well numbers 2863, 2864, and 2869 in the Buffalo Creek drainage; well numbers 2257 and 2261 in the Sandstone Creek drainage; and well numbers 2252, 2253, and 2256 in the Little Beaver Creek drainage as being within two miles of lek sites. The District Court determined that "all parties and witnesses agreed that . . . 15 gas wells at issue in this case are not located in close proximity of any of the sage grouse leks and present no risk of harm to sage grouse leks." Federations do not dispute this finding on appeal. Fidelity's Dennis Zander testified by affidavit that five of the eight disputed wells were scheduled to be drilled in 2010. At oral argument, Federations' counsel acknowledged that some of the wells at issue already had been drilled, and MBOGC's counsel indicated that only three undrilled wells remain directly at issue.

¶23 Two of the well sites, numbers 2253 and 2256, are located on surface owned by the State of Montana. In addition to the EAs prepared by the MBOGC, the DNRC prepared EAs addressing potential environmental impacts at these two sites. The DNRC indicated that the sites were within one mile of active sage grouse leks and that timing restrictions would be implemented between March 1 and June 15 of any year if permits were issued to Fidelity. However, the DNRC indicated there would otherwise be no significant impact on the sage grouse. There is no challenge to the EAs performed by

DNRC. The dispute, in essence, centers on six wells at most, and perhaps as few as three, given recent drilling activity. No party sought a stay of the District Court's order on appeal, nor does the record reflect a motion in the District Court for an injunction pending appeal. M. R. Civ. P. 62; M. R. App. P. 22.

**STANDARD OF REVIEW**

¶24     We review a district court's grant of summary judgment de novo. *Smith v. BNSF Railway*, 2008 MT 225, ¶ 10, 344 Mont. 278, 187 P.3d 639. Summary judgment is appropriate under M. R. Civ. P. 56 where there is an absence of genuine issues of material fact and a party is entitled to judgment as a matter of law. *Smith*, ¶ 10. No party has argued that disputes of material fact preclude summary judgment in this case.

¶25     The standard of review for MEPA decisions is "whether the record establishes that the agency acted arbitrarily, capriciously or unlawfully." *Ravalli County Fish & Game Assn. v. Mont. Dept. of State Lands*, 273 Mont. 371, 377, 903 P.2d 1362, 1366 (1995) (quoting *N. Fork Preservation Assn. v. Dept. of State Lands*, 238 Mont. 451, 458-59, 778 P.2d 862, 867 (1989)). A review under the arbitrary and capricious standard "does not permit a reversal merely because the record contains inconsistent evidence or evidence which might support a different result. Rather, the decision being challenged must appear to be random, unreasonable or seemingly unmotivated based on the existing record." *Hobble Diamond Ranch, LLC v. State*, 2012 MT 10, ¶ 24, 363 MT 310, 268 P.3d 31.

¶26     Decisions of the MBOGC may be set aside if the Court determines them to be

16

(a) arbitrary, unreasonable, capricious, [an] abuse of discretion or otherwise not in accordance with law; (b) contrary to constitutional right, power, privilege, or immunity; (c) in excess of statutory jurisdiction, authority, or limitations or short of statutory right; (d) without observance of procedure required by law; or (e) unwarranted by the facts[.]

Section 82-11-144(2), MCA.

## DISCUSSION

¶27    *1. Whether the District Court erred in conducting its review under § 82-11-144, MCA, and in considering evidence that was not part of the administrative record.*

¶28    Federations contend that the District Court erred in applying the standard of review set forth in § 82-11-144, MCA. That section provides in part:

> Any interested person adversely affected by any provision of this chapter or by any rule or order adopted by the board hereunder or by *any act done* or threatened thereunder may obtain court review and seek relief by a suit for an injunction against the board as defendant. . . . The suit shall be given preferential setting and shall be tried de novo and disposed of as an ordinary civil suit and not upon the record of any hearing before the board.

Section 82-11-144, MCA (emphasis added). This section is contained in the part of the Montana Code Annotated entitled "Regulation by Board of Oil and Gas Conservation," within the Oil and Gas Conservation chapter. Federations contend that a district court's review under this section does not apply to a MEPA claim but rather to other administrative actions by the MBOGC provided for in the preceding sections of the chapter. They contend that since the case was filed under MEPA, specifically § 75-1-201(6)(a)(ii), MCA (2007), the court's review is limited to the administrative record. They argue the District Court's consideration of evidence provided by Appellees that did not constitute part of the administrative record was in error. Citing *Skyline Sportsman's*

17

*Assoc. v. Bd. of Land Commrs.*, 286 Mont. 108, 951 P.2d 29 (1997), Federations contend the court's review of the outside-the-record evidence they submitted was proper, but that such supplementation of the record is not a two-way street.

¶29     We conclude that the District Court properly considered both parties' evidence. Section 82-11-111(2)(c), MCA, grants the Board authority to adopt and enforce rules to implement its objectives.   Admin. R. M. 36.22.601 requires an individual to file an application for a permit with the Board to drill an oil or gas well.  Federations' complaint sought to enjoin the Board from issuing well permits until it conducted a programmatic review in accordance with MEPA on the Cedar Creek Gas Field.  The language in § 82-11-144, MCA, applies to "a suit for an injunction" challenging *any act* of the MBOGC within its regulatory jurisdiction and specifically mentions actions involving "the right to drill a well."   Though the particular act challenged in this case is the Board's MEPA review, the legislature has directed that "when a general and particular provision are inconsistent, the latter is paramount to the former, so a particular intent will control a general one that is inconsistent with it."  Section 1-2-102, MCA.  Because § 82-11-144, MCA, governs review of MBOGC actions under a statutory framework in which review and determination of well applications is one of its primary functions, we conclude that this provision is the more particular with respect to the review of oil and gas permitting decisions.

¶30     Because the statute is dispositive on this issue, we do not further consider the parties' arguments regarding consideration of non-record evidence in other contexts.  The

District Court did not err in applying § 82-11-144, MCA, and in considering evidence outside the administrative record.

¶31   *2. Whether the District Court erred in determining that twenty-three individual environmental assessments prepared by MBOGC for gas development in the Cedar Creek Anticline were adequate under the Montana Environmental Policy Act.*

¶32   We note at the outset that since MEPA is modeled after the National Environmental Policy Act (NEPA), federal case law construing parallel provisions in NEPA is persuasive.  *Kadillak v. Anaconda Co.*, 184 Mont. 127, 137, 602 P.2d 147, 153 (1979).  MEPA is "essentially procedural."  Like its federal counterpart, "it does not demand that an agency make particular substantive decisions."  Rather, it requires "an agency to review projects, programs, legislation, and other major actions of state government significantly affecting the quality of the human environment in order to make informed decisions."  *Ravalli County Fish & Game Assn.*, 273 Mont. at 377-78, 903 P.2d at 1367.  The administrative procedures for MEPA are outlined in Title 36, Chapter 2, Sub-chapter 5 of the Administrative Rules of Montana and are discussed in more detail later in this opinion.

¶33   Federations raise three grounds in supporting their contention that the twenty-three EAs are inadequate under MEPA: 1) MBOGC failed to properly tier its review to previous studies; 2) MBOGC failed to take a "hard look" at oil and gas development in the CCA; and 3) MBOGC failed to evaluate the cumulative impacts of increased well approvals.  First, we provide additional information on the 1989 PEIS and 2003 FEIS and their analyses of the impacts of gas and oil development on sage grouse.  We then

19

address the issue of "tiering" in our analysis of the Federations' "hard look" and "cumulative impacts" arguments.

***1989 PEIS and 2003 FEIS's Reviews on Wildlife Impacts***

¶34     The draft 1989 PEIS included a section on impacts of oil and gas development on wildlife.  The draft indicated that "sage grouse, sharp-tail grouse, and waterfowl could be affected by oil and gas activity in Montana," but that a "general discussion of possible wildlife impacts on the various oil and gas regions is difficult" because of the varied topography and habitat statewide.  Moreover, the draft 1989 PEIS included a section analyzing the cumulative effect of oil and gas drilling on wildlife, stating "a cumulative effect of oil and gas drilling results from the additional development that occurs if petroleum or natural gas are found.  The discovery of gas or oil in one location often stimulates more intense exploration in that immediate area and adjacent areas."  Citing to studies on sage grouse and resource extraction, the draft analyzed areas with low to moderate impact potential for wildlife, including the sage grouse: "in nonmountainous portions of Montana, sage grouse and sharptails would be vulnerable to oil and gas activity in the spring when the birds are concentrated on strutting (mating) grounds."  Namely, construction and use of roads and powerlines could displace birds, decrease local reproduction, and result in birds being killed.  Further, the level of impact on sage grouse would vary, dependent on whether the oil or gas well proved productive.  The draft 1989 PEIS also addressed how cumulative impacts to wildlife could be mitigated and suggested efforts to protect sage grouse specifically, including creating a one-quarter-

mile buffer strip around known strutting grounds, and restricting activities in the early morning hours of spring when the grouse are active in strutting grounds.

¶35 The final 1989 PEIS noted specifically that in the majority of cases, the major adverse impacts on the environment from well siting can be avoided if proper care is taken. Notably, the final 1989 PEIS stated that other than considerations applicable to all drilling operations, "the potential for adverse impacts is almost entirely dependent on the sensitivity of individual drilling locations." In the section discussing wildlife and fisheries, the final 1989 PEIS states that "the likelihood of an adverse impact occurring in any particular locations depends on the intensity of oil and gas activity, including length of time that operations occur, sensitivity to the environment, cumulative disturbance that a wildlife species has been subjected to previously, and implementation of mitigating measures."

¶36 The 2003 FEIS provides further analysis of potential harm to wildlife and is not limited to the impacts of CBNG development (also called CBM or "coal-bed methane" development), but also includes discussion of conventional oil and gas extraction. Chapter 3 of the 2003 FEIS, titled "Wildlife," specifically notes that sage grouse are "a possible candidate for listing under the [Endangered Species Act]" and discusses in detail the sagebrush habitat the birds need to survive, along with leks. Chapter 4 of the 2003 FEIS, entitled "Environmental Consequences," describes the effect of conventional oil and gas production.

21

¶37 An example of the similar types of impacts caused by traditional oil and gas development and CBM development can be found under the "Management Common to All Alternatives" section in Chapter 4 of the 2003 FEIS (indicating the "direct and indirect impacts of road construction and use on wildlife and wildlife habitat have been well documented for oil and gas projects and other natural resource developments . . . the types of impacts expected to result from oil and gas development would be similar to those described in detail under Alternative A for [coal bed methane] development."). The impacts discussed for Alternative A include: "direct habitat loss and direct and indirect impacts because of habitat disruption and wildlife disturbance caused by roads, pipelines, and utility corridors would cause the bulk of impacts on wildlife" and that "grouse are particularly susceptible to collision mortality (from cars) during the spring because they often fly to and from leks near the ground." The analysis also includes a table outlining the anticipated impacts on sage and sharp-tailed grouse of three types of direct impact, and nine types of indirect impact. Moreover, the chapter devotes an entire page to a discussion highlighting that "sage grouse are extremely sensitive to human disturbance and habitat alteration."

### A. *"Tiering"*

¶38 "Tiering is the process of incorporating by reference coverage of general matters in broader environmental impact statements, such as national program or policy statements, into subsequent narrower environmental analyses, such as site-specific

22

statements." *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1088 (9th Cir. 2011); 40 C.F.R. § 1508.28.

¶39 The parties agree that the EAs in question do not explicitly reference the 1989 PEIS or 2003 FEIS. Richmond indicated in his affidavit to the District Court that the checklist EAs at issue in this lawsuit were tiered to the 2003 PEIS and that the MEPA review conducted in connection with the 2003 FEIS is implicitly incorporated into the checklist EAs. He admitted, however, that it was a "big oversight" that the EAs did not explicitly state they were tiered to the 1989 PEIS or specifically reference the 2003 FEIS.

¶40 Federations argue that the EAs did not tier to the previous analyses because there is no mention of the 1989 or 2003 reviews in the EAs, that the documents are not on the same issue, and that reliance on the 1989 review is suspect because it was conducted before the vast majority of the scholarly work discussing the impacts on sage grouse by oil and gas development was completed. Federations cite *S. Or. Citizens v. Clark*, 720 F.2d 1475, 1480 (9th Cir. 1983), for the proposition that agencies have a continuing duty to evaluate new information when tiering to an EIS that is more than five years old. They also argue that documentation of tiering must appear in the document being tiered from, citing *Village of False Pass v. Watt*, 565 F. Supp. 1123, 1141 (D. Alaska 1983) ("The adequacy of the environmental impact statement itself is to be judged solely by the information contained in that document. Documents not incorporated in the (EIS) by reference or contained in a supplemental (EIS) cannot be used to bolster an inadequate discussion in the (EIS)."), *aff'd* 733 F.2d 605 (9th Cir. 1984). The court in *Village of*

23

*False Pass* proceeded to state that while an administrative record cannot be used to remedy a deficiency in an EIS, a court may look at information in the administrative record and take additional evidence to determine whether the scope of discussion in the EIS was adequate. 565 F. Supp. at 1141.

¶41 The quotation cited by Federations is not in a section of the *Village of False Pass* opinion discussing tiering. Instead, the section cited pertains to the adequacy of an environmental impact statement and what a court may consider in determining whether an EIS is deficient. Moreover, an EA has been described by federal courts as a "rough-cut, low-budget environmental impact statement." *Sierra Club Northstar Chapter v. Bosworth*, 428 F. Supp. 2d 942, 957 (D. Minn. 2006) (quoting *Cronin v. U.S. Dept. of Agriculture*, 919 F.2d 439, 443 (7th Cir. 1990). To the extent an EIS is judged solely by the information it contains and its references to other documents from which it is tiered—a question not presented in this case—an EA does not have the same requirements as an EIS.

¶42 Despite the checklists' lack of explicit reference, it is clear from the record that MBOGC staff relied on these past reviews in developing the EAs at issue here. The administrative record lodged with the District Court by agreement of the parties included the 1989 PEIS and 2003 FEIS. Under the 1989 PEIS, MBOGC was required to evaluate current information and entitled to rely on FWP in assessing wildlife impacts. MBOGC fulfilled this obligation by conferring with the FWP wildlife biologist, utilizing the Heritage Tracker database, and reviewing topographic maps for designated wildlife

refuges, national grass lands, national parks, or other designated wildlife areas. Undoubtedly, an EA should make specific reference to MEPA documents from which it is tiered so that members of the public, not just the Board and others involved in the process, are made aware of the information utilized by MBOGC in issuing permits. Nonetheless, remand for the sole purpose of requiring MBOGC to explicitly incorporate by reference its prior EISs would accomplish little "save further expense and delay." *Nevada v. DOE*, 457 F.3d 78, 90 (D.C. Cir. 2006). Applying the standards of review governing MBOGC and MEPA determinations, particularly in light of the stipulated administrative record before the District Court, we conclude the agency implicitly tiered the EAs to the older analyses and that its failure to articulate reference to them did not render its actions arbitrary, capricious or unlawful.

### B. MBOGC's compliance with MEPA's requirements.

¶43 The purpose underscoring MEPA is to "declare a state policy that will encourage productive and enjoyable harmony between humans and their environment." Section 75-1-102(2), MCA. MEPA requires that an agency take a "hard look" at the environmental impacts of a given project or proposal. *Ravalli County Fish & Game Assn.*, 273 Mont. at 377, 903 P.2d at 1367 (agencies have the obligation "to make an adequate compilation of relevant information, to analyze it reasonably," and to consider all "pertinent data."). However, "court review of an agency decision . . . is limited . . . [and the Court] does not take a hard look itself but requires that the agency does so. The Court focuses on the validity and appropriateness of the administrative decision making process without

25

intense scrutiny of the decision itself." *Clark Fork Coalition v. Mont. Dept. of Envtl. Quality*, 2008 MT 407, ¶ 47, 347 Mont. 197, 197 P.3d 482. "The agency must examine the relevant data and articulate a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *Clark Fork Coalition*, ¶ 47. Courts have held that "general statements about 'possible' effects and the existence of 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided." *Neighbors of Cuddy Mt. v. USFS*, 137 F.3d 1372, 1380 (9th Cir. 1998) (quoting *Inland Empire Pub. Lands Council v. U.S. Forest Serv.*, 88 F.3d 754, 764 (9th Cir. 1996).

¶44 The general requirements of the environmental review process under MEPA and the means in which an agency determines the necessary level of environmental review are contained in Admin. R. M. 36.2.523. A detailed environmental impact statement is required for a "major action of state government significantly affecting the quality of the human environment." Admin. R. M. 36.2.523(1)(b). An environmental assessment operates, in part, as an initial evaluation to determine whether an agency must prepare an environmental impact statement. Admin. R. M. 36.2.522(9). An EA may be in checklist form when the agency determines a routine action with limited environmental impact is at stake. Admin. R. M. 36.2.525(2).

¶45 In determining the significance of the impacts associated with state action, and what type of assessment is necessary, the state agency must evaluate the individual and cumulative impacts. Admin. R. M. 36.2.524(1). An EA must include an evaluation of

26

cumulative and secondary impacts.  Admin. R. M. 36.2.525(3)(d).  We review whether the agency performed an evaluation of cumulative impacts in determining whether its compliance with MEPA was lawful.  *N. Fork Preservation Assn.*, 238 Mont. at 460, 778 P.2d at 868.  An analysis of "cumulative impacts" means reviewing:

> the collective impacts on the human environment of the proposed action when considered *in conjunction with other past and present actions* related to the proposed action by location or generic type.  Related future actions must also be considered when these actions are *under concurrent consideration* by any state agency through pre-impact statement studies, separate impact statement evaluation, or permit processing procedures.

Admin. R. M. 36.2.522 (emphases added).

¶46    Federations argue that the twenty-three EAs at issue are virtually identical and contain no evaluation of the potential impacts to wildlife, in particular, sage grouse.  They further argue the 1989 PEIS and 2003 FEIS both contemplate the need for further site specific analysis, which did not occur here.  Federations point to the two EAs prepared by the DNRC as an example of an EA appropriately acknowledging the presence of and risk to sage grouse on the well sites at issue.  They argue "the fact that MBOGC's parent agency identified sage grouse leks within a mile of wells 2253 and 2256, and MBOGC failed to identify these same leks when it evaluated the same wells under the same MEPA standard demonstrates the patent inadequacy of MBOGC's environmental review."  Federations argue the checklist utilized by MBOGC did not address cumulative effects because it ignored the other twenty-three wells being concurrently permitted in the same area, and that its overall assessment did not amount to a "hard look" at the impacts of the wells.

27

¶47    In response, MBOGC emphasizes Sasaki's affidavit, which observes that the EA checklist form requires consideration of the circumstances of each well and its cumulative effect, if any. Sasaki noted in the cumulative effects section of the EAs that the wells are being drilled in "an existing gas field." He testified by affidavit that each EA was completed individually, and pointed out that the forms contain distinct responses where differences exist. Sasaki determined that because of the hundreds of existing wells in the immediate area and their associated infrastructure, the addition of these twenty-three wells would not create new human access to wildlife habitat. He pointed out that, in contrast to State-owned land, the MBOGC has no authority to impose surface restrictions upon wells drilled on private land. Sasaki also determined that the twenty-three wells would not lead to further cumulative impacts from oil and gas drilling in the CCA.

¶48    In both the EISs, the agency addressed cumulative impacts. The draft 1989 PEIS includes a six-paragraph discussion under the sub-heading "cumulative impacts." The section identified the cumulative impacts of oil and gas drilling when coupled with other resource extraction, such as logging, mining, hydroelectric development, and livestock grazing. The final 1989 PEIS includes a summary of potential impacts to wildlife and fisheries, noting specifically that "[t]he likelihood of an adverse impact occurring in any particular location depends on the intensity of oil and gas activity, including length of time that operations occur, sensitivity of the environment, cumulative disturbance that a wildlife species has been subjected to previously, and implementation of mitigation

28

measures." Moreover, the final 1989 PEIS concludes that the situation where "major adverse environmental effects are most likely is when a wildcat drilling operation leads to discovery of a commercially producible oil or gas reservoir and full-field production commences in a previously undeveloped area." In the 2003 FEIS, the "Reasonably Foreseeable Development Scenario" analyzed the combined exploration and development of coal bed methane and of conventional oil and gas development in various counties. Additionally, cumulative impacts (including the impact of conventional oil and gas development) are also analyzed in Chapter 4's discussion on wildlife.

¶49 We agree with Federations that the simple fact that these twenty-three wells are infill wells in an existing field does not automatically insulate them from a cumulative impacts analysis. We conclude, however, that the Board did not ignore cumulative impacts in its assessment of the wells authorized in this case. The agency completed the EAs here on the basis of an extensive administrative record and an institutional body of knowledge upon which MBOGC staff determined the additional wells at issue would have no significant impact, individually or cumulatively. As we noted earlier, the wells at issue are a minor fraction of the over a thousand wells in the Cedar Creek Gas Field. Infill development may prompt the need for further analysis if the characteristics of the location suggest the addition of new wells will increase "the collective impacts to the human environment." However, on the record of this case—given the few number of well permits still in play, their minimal addition to an already significantly developed field, and the absence of indicators that sensitive habitat was involved, we hold that the

29

EAs' silence regarding other specific well applications under consideration did not render them unlawful under Admin. R. M. 36.2.525 for failure to sufficiently assess cumulative impacts.

¶50 The Dissent makes an important point which, under a different set of facts, would be compelling. Even a checklist EA should provide sufficient environmental information for informed public scrutiny before decisions are made. Federations' argument in this case, however, is that the MBOGC's "decisions approving each of the 23 wells should be set aside" as arbitrary and capricious because its determination of no cumulative impacts was "made without making any analysis at all." As Federations point out, we have recognized that the omission of a cumulative impacts analysis is relevant to determining whether an agency's MEPA decision is "unlawful." *Friends of the Wild Swan v. DNRC*, 301 Mont. 1, ¶ 29, 6 P.3d 972 (2000). In that case, however, as Federations acknowledge, the district court had enjoined the agency from moving forward pending completion of the cumulative impacts analysis, and we upheld that injunction on appeal. Here, since no stay was sought or obtained, we did not have an opportunity to rule before the agency's decision took effect; thus, the question now is limited to a much smaller number of wells. Further, as discussed above, and not disputed by the Dissent, our examination of the sufficiency of the MBOGC's "hard look" under the applicable statute is to be made on the entire record before the District Court. Section 82-11-144, MCA. On that record, and in light of the present posture of the case, we conclude that the agency's evaluation of cumulative effects was adequate. Federations have not

30

demonstrated that adding the three to six remaining wells under consideration to the existing Cedar Creek Gas Field, particularly in light of DNRC restrictions on the two wells on State-owned land, would raise the potential for cumulative impacts sufficient to trigger additional environmental analysis.[1]  Fidelity's counsel acknowledged during oral argument that, had sage grouse been listed as a threatened or endangered species, significant additional analysis would have been required.  We trust that MBOGC will consider the recent pronouncements by the U.S. Fish and Wildlife Service in its future permitting decisions.

¶51    We affirm the District Court's conclusion that the MBOGC took a sufficient "hard look" under MEPA.  Sasaki relied on the information in the 1989 PEIS and 2003 FEIS, his communications with FWP, his review of the Heritage Tracker database, and his analysis of topographic maps of the area.  In his affidavit to the District Court, Sasaki rationally explained these steps, and the facts upon which he relied, to come to the conclusion that the additional wells would not lead to further cumulative impacts.  He also relied on his own knowledge of the area, having previously prepared 325 EAs for the Cedar Creek Gas Field and conducted multiple site visits.  The administrative record contains hundreds of pages of documentation of the Board's analysis of gas well drilling in the area in question over many years.  The compilation of data from the two major environmental studies in 1989 and 2003, along with other Board documentation and

---

[1] Even under the Ninth Circuit's relatively low standard of proof, a plaintiff alleging that an agency should have analyzed the cumulative impacts of a proposed project along with other projects must show "the potential for cumulative impact." *Te-Moak Tribe of Western Shoshone of Nev. v. U.S. DOI*, 608 F.3d 592, 605 (9th Cir. 2010).

31

scientific literature, coupled with the institutionalized knowledge of MBOGC staff, provides an extensive information base upon which the Board could draw in concluding that the addition of twenty-three wells in a heavily-developed field would have limited impact. Our role is not to say whether the Court would have granted the permits in this instance. *N. Fork Preservation Assn.*, 238 Mont. at 465, 778 P.2d at 871. Rather, we must determine if the MBOGC was sufficiently thorough and discerning in its decision-making process to meet applicable MEPA requirements. We conclude it was.

¶52    *3.   Whether the District Court erred in ruling that MBOGC did not have to prepare a programmatic environmental impact statement for oil and gas development in the Cedar Creek Anticline area.*

¶53    A "programmatic review" is "an analysis (EIS or EA) of the impacts on the quality of the human environment of related actions, programs, or policies." Admin. R. M. 36.2.522(15). As noted above, an EIS is required for "major actions of state government significantly affecting the quality of the human environment." Section 75-1-201(1)(b)(iv), MCA. An "action" is defined in part as "a project or activity involving the issuance of a lease, permit, license, certificate or other entitlement." Admin. R. M. 36.2.522(1). An EIS is not required if an agency, after evaluating the factors in Admin. R. M. 36.2.524(1), determines that the adverse effects are not significant. Those factors are:

> (a) the severity, duration, geographic extent, and frequency of occurrence of the impact;
> (b) the probability that the impact will occur if the proposed action occurs; or conversely, reasonable assurance in keeping with the potential severity of an impact that the impact will not occur;

32

(c) growth-inducing or growth-inhibiting aspects of the impact, including the relationship or contribution of the impact to cumulative impacts;
(d) the quantity and quality of each environmental resource or value that would be affected, including the uniqueness and fragility of those resources or values;
(e) the importance to the state and to society of each environmental resource or value that would be affected;
(f) any precedent that would be set as a result of an impact of the proposed action that would commit the department to future actions with significant impacts or a decision in principle about such future actions; and
(g) potential conflict with local, state, or federal laws, requirements, or formal plans.

Admin. R. M. 36.2.524. An EA is highly specific to the project and locale, "thus creating no binding precedent." *Barnes v. U.S. Dept. of Trans.*, 655 F.3d 1124, 1140 (9th Cir. 2011).

¶54 Environmental review under NEPA (and therefore MEPA) is not retroactive. Activity existing prior to enactment of the law and not potentially undergoing "further major [] action" does not require an EIS. *Westside Property Owners v. Schlesinger*, 597 F.2d 1214, 1223-24 (9th Cir. 1979). "If an ongoing project undergoes changes which themselves amount to 'major [state] actions,' the operating agency must prepare an EIS." *Ravalli County Fish & Game Assn.*, 273 Mont. at 378-79, 903 P.2d at 1367 (quoting *Upper Snake R. Chapter of Trout Unlimited v. Hodel*, 921 F.2d 232, 234 (9th Cir. 1990)). Where a proposed action would not change the status quo, the MEPA review process is not triggered. *Ravalli County Fish & Game Assn.*, 273 Mont. at 378-79, 903 P.2d at 1367; *Upper Snake R. Chapter of Trout Unlimited*, 921 F.2d at 235. "An EIS need not discuss the environmental effects of continuing to use land in the manner in which it is presently being used." *Sabine R. Authority v. U.S. Dept. of Interior*, 951 F.2d 669, 679

33

(5th Cir. 1992) (citing *Upper Snake R. Chapter of Trout Unlimited*, 921 F.2d at 235) (holding that an agency's acquisition of an easement did not effectuate any change to the environment that would trigger an EIS).

¶55   If the changes are "substantial enough to constitute a 'major federal [or state] action'" or have the potential to significantly affect the quality of the human environment, then MEPA—like NEPA—requires the agency to evaluate those changes for significant impacts. *Compare Westside Property Owners*, 597 F.2d at 1223 (post-NEPA agreement for military training exercises not a "major federal action" in light of longstanding approval of design for training program) *with Ravalli County Fish & Game Assn.*, 273 Mont. at 379-80, 903 P.2d at 1368 (change in grazing permit from grazing cattle to grazing sheep adjacent to bighorn range did not constitute maintaining the status quo and further MEPA analysis was triggered).

¶56   In 2003, the MBOGC issued an order granting Fidelity's application to increase well density in the CCA. Though it might have been an opportune time to do so, Federations did not seek a programmatic EIS when that order was issued.

¶57   Richmond explained in a letter to NWF in 2008, submitted by Federations as an exhibit to their motion for summary judgment, that the order authorizing increased well density was issued as a means to address inequities between adjoining landowners. He explained that its effect was both to serve as a determination that the well spacing did not constitute waste by promoting unnecessary wells and to promote conservation by maximizing the recovery of existing gas resources. Richmond advised that it was

34

unlikely the number of wells authorized by the Board Order "will be drilled immediately." He noted that the average five-year net increase in producing gas wells for the Montana portion of the Williston Basin is seventy-one new wells per year. Through the affidavit of Bruce Bowman, Fidelity confirmed in the District Court that it anticipated drilling approximately 40-100 wells per year in 2009 and 2010.

¶58 At the time the permits were issued in this case, much of the infrastructure already was in place with only minor improvements needed. Fidelity employee Dennis Zander described in his affidavit to the court Fidelity's attempt to minimize the impact of the gas wells at issue. Noting Gore's concerns that eight of the wells could adversely impact sage grouse, Zander explained that "the infrastructure Fidelity will install with respect to these eight wells is minimal." Zander provided specific comments about the limited impacts of the wells, including their virtually silent operation and Fidelity's ability to access the wells' electronic metering equipment remotely. Once a well is completed, there is little vehicular traffic associated with its operation, with most wells being accessed by vehicle less than once a week. He stated that this method of production operations has been commended by BLM biologists for minimizing noise that might impact sage grouse.

¶59 Despite the Board's finding of no significant impacts, Federations contend that the MBOGC must perform a programmatic review of ongoing oil and gas development in the CCA, pointing to Fidelity's anticipated drilling in the future. They further argue that the 1989 PEIS was not a programmatic review, but rather a "framework" for the agency's

35

future performance of MEPA reviews and that further area-specific review was contemplated by the agency and is necessary. Appellees argue that the addition of twenty-three wells (now six or fewer), is not a "major state action" requiring a programmatic review and that speculation about future drilling does not provide a basis for mandating an EIS in this case.

¶60    We conclude that the Board was not arbitrary or capricious in its determination that drilling twenty-three wells in an existing field of over a thousand, with most of the necessary infrastructure already in place and minimal anticipated impacts, was not a major state action necessitating a programmatic EIS. Incremental infill well development on the field may necessitate an EIS if, at some point, such development meets the factors discussed in Admin. R. M. 36.2.524. Our holding here does not preclude the requirement for an EIS at a future date. *Barnes*, 655 F.3d at 1140. On this record, Federations have not met their burden of demonstrating that MBOGC's decision was arbitrary, capricious, unlawful, or unwarranted by the facts.

## CONCLUSION

¶61    The District Court properly applied § 82-11-144, MCA, in considering evidence outside the administrative record. We caution MBOGC that its use of the checklist EA form, while permissible under the law and under the 1989 EIS, should contain sufficient explanation to provide the public and a reviewing court with a clear statement of reasons to explain why a project's impacts are not significant. On the basis of the record developed in the District Court, however, we conclude that MBOGC complied with

36

MEPA in issuing permits for the wells at issue. Under the specific facts existing at the time these permits were issued, Federations did not demonstrate the need for further cumulative impacts analysis or for a programmatic EIS as to oil and gas development in the CCA. The District Court's grant of summary judgment in favor of Appellees is affirmed.


/S/ BETH BAKER


We concur:

/S/ MIKE McGRATH
/S/ PATRICIA COTTER
/S/ JIM RICE

/S/ JAMES B. WHEELIS
Hon. James B. Wheelis, District Judge
Sitting in place of Justice Nelson


Justice Michael E Wheat dissents.

¶62    I respectfully dissent.

¶63    The majority correctly notes that an EA may be in a checklist format. *Opinion,*

¶ 44. A checklist EA, however, must still comply with the requirements of MEPA. This

37

includes an analysis of the cumulative and secondary impacts. *Opinion*, ¶ 45. The majority concludes, based on the "extensive administrative record and [the] institutional body of knowledge" within the MBOGC, that the MBOGC did not ignore cumulative impacts in its assessment of the wells at issue. *Opinion*, ¶ 49. This conclusion, however, ignores the unambiguous intent of the Legislature and the very purpose of requiring an environmental assessment. MEPA is procedural, but it was the intent of the Legislature that MEPA would provide an adequate review of state actions to ensure that "the public is informed of the anticipated impacts in Montana of potential state actions." Section 75-1-102(b), MCA. The Legislature additionally made it clear that the unequivocal purpose of requiring an environmental assessment is to "inform the public and public officials of potential impacts resulting from decisions made by state agencies." Section 75-1-102(3)(a); *See State ex. rel. Mont. Wilderness Assn. v. Board of Nat. Resources & Conservation*, 200 Mont. 11, 30, 648 P.2d 734, 744 (1982) ("The primary function of the EIS is to provide the decisionmaker with environmental reports sufficiently detailed to allow a knowledgeable judgment and to allow public feedback in the development of that information.")

¶64 The public is not informed when an agency's decision-making process is concealed within the confines of its institutional knowledge, and the only way to uncover the details is by engaging in lengthy litigation. Nor is the public benefitted by reviewing an EA which does not explicitly set forth the actual cumulative impacts and the facts which form the basis of the analysis. *See Friends of Wild Swan v. Dept. of Nat.*

*Resources & Conservation*, 2000 MT 209, ¶ 35, 301 Mont. 1, 6 P.3d 972. Because the public has been left in the dark, I would reverse the District Court and find that the MBOGC's EAs are inadequate.

¶65 I believe that the EAs are inadequate because they contain only generalized conclusory statements in the form of expert narratives – or as the majority calls it, "institutional knowledge." Each of the twenty-three EAs devotes a single line to "Evaluation of Impacts and Cumulative effects." The "answer" to this question is some variation on the statement: "No long term impacts expected. Short term impacts will occur but can be mitigated in time." This explanation is inadequate because it provides no information to the public, thereby undermining the purpose of MEPA and preventing any meaningful public participation.

¶66 Moreover, the EAs are not properly tiered to the 1989 PEIS and the 2003 FEIS. Tiering is not defined in MEPA or its associated administrative rules. It is, however, defined in NEPA's regulations:

> "Tiering" refers to the coverage of general matters in broader environmental impact statements (such as national program or policy statements) with subsequent narrower statements or *environmental analyses* (such as regional or basinwide program statements or ultimately site-specific statements) *incorporating by reference the general discussions* and concentrating solely on the issues specific to the statement subsequently prepared.

40 C.F.R. § 1508.28 (2012) (emphasis added). The plain language under NEPA requires the tiered document to be explicitly incorporated. This insures that the public is informed of the documents underlying an agency decision.

39

¶67    Here, MBOGC admits that it failed to explicitly reference that the EAs were tiered to the 1989 PEIS or the 2003 FEIS. *Opinion*, ¶ 39. The majority disregards this failure and claims that it is "clear from the record that MBOGC staff relied on these past reviews in developing the EAs at issue here." *Opinion*, ¶ 42. MBOGC's reliance on these documents is appropriate, but it remains that the public was not informed of this reliance at the time the EAs were published. Consequently, because the EAs were completely devoid of any mention or reference to these EISs, they are inadequate.

¶68    Even if the agency did implicitly tier the EAs to the prior EISs, I would still find the EAs inadequate because MBOGC's failure to reference them in the EAs undermines the purpose of MEPA. MEPA requires MBOGC to inform the public of not only the documents it relies on, but also the specific information within the relied upon documents. MBOGC did neither. As a result, the public remains uninformed and is unable to meaningfully participate in the MEPA process.

¶69    The actions of the MBOGC are not only improper, but they undermine MEPA. Given that MEPA is a procedural statute, I cannot condone the EAs at issue because they are not in compliance with MEPA's plainly articulated procedures. The cumulative impacts and any tiered documents should have been clearly set forth to ensure an informed public. Instead, the MBOGC's failure to comply with MEPA has forced the public to engage in time consuming and costly litigation. I believe that the public should not be forced to rely on litigation to uncover information that rightly should have been disclosed in the EAs.

40

¶70    For these reasons, I would find that the EAs at issue are unlawful. *See N. Fork Preservation Assn.*, 238 Mont. 451, 460-64, 778 P.2d 862, 868-70 (1989).   I would therefore reverse the District Court's grant of summary judgment and remand this case for entry of judgment in favor of the Federations.


/S/ MICHAEL E WHEAT


Justice Brian Morris joins in the foregoing dissent.


/S/ BRIAN MORRIS