

FILED

09/21/2021

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 20-0391

DA 20-0391

IN THE SUPREME COURT OF THE STATE OF MONTANA

2021 MT 240

TRACY FORTNER and MARCY FORTNER,

> Petitioners and Appellants,

v.

BROADWATER CONSERVATION DISTRICT,

> Respondent and Appellee.

FILED

SEP 2 1 2021

Bowen Greenwood
Clerk of Supreme Court
State of Montana

APPEAL FROM:     District Court of the First Judicial District,
In and For the County of Broadwater, Cause No. BDV-2019-45
Honorable Michael F. McMahon, Presiding Judge

COUNSEL OF RECORD:

> For Appellants:

> Hertha L. Lund, Christopher T. Scoones, Ben F. Stormes, Lund Law, PLLC,
> Bozeman, Montana

> For Appellee:

> Cory J. Swanson, Broadwater County Attorney, Townsend, Montana

Submitted on Briefs:  July 14, 2021

Decided:  September 21, 2021

Filed:

_____
Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1 Tracy and Marcy Fortner appeal a First Judicial District Court decision upholding a declaratory ruling by the Broadwater Conservation District determining that Montana Gulch is a "stream" subject to the regulatory provisions of The Natural Streambed and Land Preservation Act of 1975. We affirm.

¶2 We restate the issues on appeal as follows:

*Issue One: Whether a stream that does not currently have perennial flow—but would have, absent human alterations—may be classified as a "natural, perennial-flowing stream" under § 75-7-103, MCA, subject to the jurisdiction of The Natural Streambed and Land Preservation Act of 1975.*

*Issue Two: Whether a stream's flow prior to 1975 may be considered for purposes of determining whether it is a "natural, perennial-flowing stream" under § 75-7-103, MCA, subject to the jurisdiction of The Natural Streambed and Land Preservation Act of 1975.*

*Issue Three: Whether the Broadwater Conservation District was arbitrary and capricious in finding that, but for human mining activity, Montana Gulch would exhibit perennial surface flow throughout its course.*

*Issue Four: Whether the Broadwater Conservation District and the District Court incorrectly considered groundwater as part of Montana Gulch.*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 In February 2017, the Broadwater Conservation District (BCD) began proceedings against Tracy and Marcy Fortner (the Fortners) for allegedly making unpermitted disturbances of the stream channel of Montana Gulch—a tributary of Confederate Gulch, which flows from the Big Belt mountains into the Missouri River. Pursuant to § 75-7-125(2), MCA, the Fortners sought a declaratory ruling that BCD did not have jurisdiction over Montana Gulch, arguing that the water body did not exhibit perennial flow

2

and was therefore not a "stream" as defined by applicable law. BCD appointed a Department of Natural Resources & Conservation hydrogeologist as a hearing officer whom they instructed to "determine whether [the specified] human disruptions had the effect of a diversion, impoundment, appropriation or other human manipulation of a perennial flow of water." In October 2018, the Hearing Officer presided over a public hearing at which the BCD Supervisors were also in attendance.

¶4 In February 2019, the Hearing Officer issued a proposed declaratory order concluding that, while the upper reaches of Montana Gulch were perennial and within BCD's jurisdiction, the rest of Montana Gulch—including the location of the Fortners' disturbances—was not perennial and therefore not within BCD's jurisdiction. The proposed ruling reasoned that "Montana Gulch likely has always had a natural flow throughout its course" and that mining activity had "drastically altered" these portions of Montana Gulch. Nevertheless, the Hearing Officer concluded that "nothing in the record proves Montana Gulch flowed perennially from mouth to source prior to historic or contemporary mining" and the "lack of pre-mining records" made it "impossible to determine the flow characteristics" of Montana Gulch prior to mining activity. In light of this uncertainty, the Hearing Officer recommended finding no jurisdiction over the project area.

¶5 In its June 2019 final declaratory ruling, however, BCD declined to adopt the Hearing Officer's proposed order, instead concluding that "the record is clear that if not for human activity, water would flow perennially down Montana Gulch" through the

3

Fortner project area, rendering it a "natural, perennially-flowing stream under Montana law."

¶6 The Fortners filed a petition for judicial review of BCD's final declaratory ruling. The District Court upheld the BCD ruling, determining that BCD owed no deference to the proposed findings of the Hearing Officer, that a stream that would have flowed perennially but for human activity is a "natural, perennial-flowing stream" under § 75-7-103, MCA, and that there was sufficient evidence such that BCD was not arbitrary and capricious in concluding that Montana Gulch was one such historically perennial stream. The Fortners now appeal to this Court.

## STANDARD OF REVIEW

¶7 Pursuant to statute, a conservation district's declaratory ruling is subject to judicial review and may be reversed or modified if:

> substantial rights of the appellant have been prejudiced because the ruling is:
> (a) in violation of constitutional or statutory provisions;
> (b) in excess of the statutory authority of the supervisors;
> (c) affected by error of law; or
> (d) arbitrary or capricious, characterized by abuse of discretion, or a clearly unwarranted exercise of discretion.

Section 75-7-125(4), MCA.

¶8 To establish that an agency decision was arbitrary and capricious under § 75-7-125(4)(d), MCA, the challenging party must bear the burden of proving that the conservation district's decision was "random, unreasonable, or seemingly unmotivated based on the existing record." *City of Livingston v. Park Conservation Dist.*, 2013 MT 234, ¶ 16, 371 Mont. 303, 307 P.3d 317 (internal quotation and citation omitted). Legal

4

conclusions by the conservation district and the district court are reviewed de novo for correctness. *Stalowy v. Flathead Conservation Dist.*, 2020 MT 155, ¶ 10, 400 Mont. 266, 465 P.3d 1170; *Larson v. State*, 2019 MT 28, ¶ 16, 394 Mont. 167, 434 P.3d 241.

¶9 A district court "may not alter a decision merely because the record contains inconsistent evidence or evidence that might support a different result" and "may not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact." *City of Livingston*, ¶ 10, *Bitterroot River Protective Ass'n v. Bitterroot Conservation Dist.*, 2008 MT 377, ¶ 18, 346 Mont. 507, 198 P.3d 219) (internal quotation and citation omitted). However, courts do not "automatically defer to the agency without carefully reviewing the record and satisfying themselves that the agency has made a reasoned decision." *Clark Fork Coal. v. Mont. Dep't of Envtl. Quality*, 2008 MT 407, ¶ 21, 347 Mont. 197, 197 P.3d 482. On appeal, this Court applies the same standard of review when reviewing a district court's decision to affirm the agency decision. *Stalowy*, ¶ 8.

## DISCUSSION

¶10 *Issue One: Whether a stream that does not currently have perennial flow—but would have, absent human alterations—may be classified as a "natural, perennial-flowing stream" under § 75-7-103, MCA, subject to the jurisdiction of The Natural Streambed and Land Preservation Act of 1975.*

¶11 The Natural Streambed and Land Preservation Act of 1975 (Streambed Act), codified at § 75-7-101 through 125, MCA, provides that "[i]t is the policy of the state of Montana that its natural rivers and streams and the lands and property immediately adjacent to them within the state are to be protected and preserved in their natural or existing state and to prohibit unauthorized projects . . . ." Section 75-7-102, MCA. The Streambed Act

5

gives conservation districts jurisdiction over applicable projects within the beds or banks of streams under its jurisdiction. Section 75-7-112, MCA. A conservation district may enforce the Streambed Act on "projects on any natural perennial-flowing stream or portions thereof, including its channels." Admin R. M. 36.2.407 (1997).

¶12 A "[s]tream" is defined as "any natural, perennial-flowing stream or river, its bed, and its immediate banks . . . ." Section 75-7-103(6), MCA. Administrative Rule of Montana 36.2.402(7) (1997) defines a "[n]atural, perennial flowing stream," in turn, as "a stream which in the absence of diversion, impoundment, appropriation, or extreme drought flows continuously at all seasons of the year and during dry as well as wet years."[1] Similarly, "[a] district may consider a stream to flow perennially if it dries up periodically due to man-made causes, or extreme drought." Admin. R. M. 36.2.407(1).

¶13 The Fortners challenge the District Court's conclusion that a "natural, perennial-flowing stream" under § 75-7-103(6), MCA, may be one that, though it does not currently flow continuously in all seasons of the year, *would have done so* in the absence of prior human intervention. They argue that this provision should instead be interpreted to require the waterbody to exhibit existing perennial flow.

---

[1] The parties do not raise the validity of Admin. R. M. 36.2.402(7)'s interpretation of § 75-7-103(6), MCA, as requiring continuous year-round, rather than merely annual, flow. *See Perennial, American Heritage Dictionary of the English Language*, (3d ed. 1996) ("[2.]b. Appearing again and again; recurrent."); *Mont. Trout Unlimited v. Dep't Natural Res. & Conservation*, 2006 MT 72, ¶ 36, 331 Mont. 483, 133 P.3d 224 ("We evaluate whether the agency's interpretation adhered to the statutory language when determining whether the agency met" the standard for valid agency interpretations of statute under § 2-4-305(6), MCA.). We confine our analysis to the issues raised by the parties here.

¶14 The Fortners argue that BCD misapplied this Court's ruling in *Bitterroot* when BCD stated that it had "examined 'the nature and extent of man's impact' upon the stream . . . and determined 'the stream would otherwise flow continuously'" but for human alteration. (Quoting *Bitterroot*, ¶¶ 39-40.) The Fortners contend that nothing in *Bitterroot* allows a conservation district to find jurisdiction over a stream which does not *currently* flow perennially.

¶15 Indeed, it was undisputed in *Bitterroot* that the water body at issue, the Mitchell Slough, exhibited perennial flow at the time of the case. The key legal issue stemmed from the fact that most of the Mitchell Slough's water was derived from an artificial diversion of the Bitterroot River. *Bitterroot*, ¶ 45. The *Bitterroot* Court rejected the idea that the Streambed Act's use of the word "natural" necessarily "exclude[s] streams with *any* human influence" from its jurisdiction. *Stalowy*, ¶ 22 (citing *Bitterroot*, ¶¶ 34, 37) (emphasis in original). Instead, the *Bitterroot* Court focused on the "nature and extent of man's impact" on the waterway. *Bitterroot*, ¶ 40. The *Bitterroot* Court specifically declined to analogize its holding to one implicated by Admin. R. M. 36.2.402(7), which it found "provides protection for the stream which runs dry, if the stream would otherwise flow continuously," absent the specified human interventions. *Bitterroot*, ¶ 39. Thus, *Bitterroot* is of limited applicability here, where it is alleged that Montana Gulch ran dry but would otherwise flow continuously, but for human intervention.

¶16 The Fortners' preferred approach essentially requires a stream to currently be both "natural" and "perennial-flowing," such that Montana Gulch's current undisputed lack of perennial flow along the relevant portions of its course would end the jurisdictional inquiry.

7

However, the statutory language simply grants jurisdiction over any "natural, perennial-flowing stream"; it does not require a stream that is "natural *and* perennial-flowing." In matters of statutory interpretation, we read statutes in the context of their entirety and do not insert what the Legislature has omitted. *See* §§ 1-2-101, -106, MCA. Here, the Legislature clearly placed the word "natural" in a position to modify the term "perennial-flowing," requiring the entire phrase to be read in continuity, not as two independent jurisdictional requirements.

¶17 BCD and the District Court interpreted the term "natural, perennial-flowing stream" as a whole, concluding that it could encompass a stream that does not currently exhibit perennial flow, but *would have done so* absent human manipulation. The court relied on Admin. R. M. 36.2.402(7), which defines a "natural, perennial-flowing stream" as "a stream which in the absence of diversion, impoundment, appropriation, or extreme drought flows continuously at all seasons of the year and during dry as well as wet years" and on Admin. R. M. 36.2.407(iv), which provides that a "[conservation] district may consider a stream to flow perennially if it dries up periodically due to man-made causes, or extreme drought." Admin. R. M. 36.2.402(7) "provides protection for the stream which runs dry, if the stream would otherwise flow continuously," absent the specified human interventions. *Bitterroot*, ¶ 39.

¶18 The Fortners argue that Admin. R. M. 36.2.402(7) does not apply here, contending that human mining activity allegedly driving surface water underground is not a "diversion, impoundment, [or] appropriation." It is not apparent to us that mining activity that impacts a watercourse could never constitute a "diversion, impoundment, [or] appropriation."

8

Regardless, Admin. R. M. 36.2.407 allows a stream to be considered perennially-flowing "if it dries up periodically due to man-made causes." A stream that would have flowed perennially, but for human mining activity, falls squarely within the language of this Rule.

¶19 This interpretation is consistent with relevant caselaw on the matter. In *Paulson v. Flathead Conservation Dist.*, we reviewed an arbitration decision over whether the Flathead County Lakeshore Protection Program (Lakeshore Program), the Flathead Conservation District, or both, had jurisdiction over Flathead Lake, which, due to an artificial impoundment, sits over what was once the Swan River. 2004 MT 136, 321 Mont. 364, 91 P.3d 569. Notwithstanding application of the Lakeshore Program over Flathead Lake, we affirmed the viability of concurrent Streambed Act jurisdiction. Relevant here, the *Paulson* Court noted that the conservation district's jurisdiction could continue to exist "where a river once flowed before lake waters were expanded as a result of construction of a dam." *Paulson*, ¶ 28. This reasoning necessarily accepted the premise that, as a legal matter, a "natural, perennial-flowing stream" may be a waterbody that, due to human activity, is hydrologically no longer a "perennial-flowing stream."

¶20 Our recent decision in *Stalowy* is even more on point. In *Stalowy*, evidence supported the determination that North Bear Creek had historically exhibited natural, continuous surface flow. *Stalowy*, ¶ 7. However, its surface flow had become intermittent as a result of recent human diversion and appropriation, though subsurface flow continued. *Stalowy*, ¶ 7. We upheld the conservation district's finding of jurisdiction in the "limited factual circumstances" where "groundwater flowing through North Bear Creek's historical channel" supported a finding of jurisdiction based on the conclusion that "human activities

9

have caused North Bear Creek to run dry during summer months." *Stalowy*, ¶ 29. These factual circumstances are applicable here, where it is alleged that human mining activity has caused Montana Gulch to lose its perennial surface flow.

¶21 Finally, we note that the Streambed Act was intended to "protect the use of water for any useful or beneficial purpose as guaranteed by The Constitution of the State of Montana" and to fulfill the constitutional directive to "prevent unreasonable depletion and degradation of natural resources." Section 75-7-102(1-2), MCA; Mont. Const. art. IX, § 1(3); *Bitterroot*, ¶ 45. An interpretation of the Streambed Act's jurisdictional threshold that allowed for its evasion by depleting the resource to the point where the stream's surface flow is no longer perennial would be clearly at odds with this purpose. *See* § 1-2-102, MCA (providing that "the intention of the legislature is to be pursued if possible" when interpreting a statute). Thus, BCD and the District Court did not err in determining that Montana Gulch could be classified as a "natural, perennial-flowing stream" under the jurisdiction of the Streambed Act upon a finding that it would have flowed perennially without human activity.[2]

---

[2] The Fortners also dispute BCD's contention that the Hearing Officer was required to comply with BCD's directive to use the legal standard for a "natural, perennial-flowing stream" provided by BCD. However, they do not challenge the District Court's conclusion that the BCD Supervisors, who attended the hearing, owed no deference to the proposed findings of its Hearing Officer. Whether the Hearing Officer was bound to use the legal standard provided to him by BCD is therefore irrelevant to the present dispute regarding the final declaratory ruling issued by the BCD Supervisors. The Fortners' only real argument on the issue is that the Hearing Officer's proposed declaratory order should be adopted because it was supported by "unrefuted expert testimony." The evidence supporting BCD's factual determination is addressed elsewhere in this Opinion.

10

¶22 *Issue Two: Whether a stream's flow prior to 1975 may be considered for purposes of determining whether it is a "natural, perennial-flowing stream" under § 75-7-103, MCA, subject to the jurisdiction of The Natural Streambed and Land Preservation Act of 1975.*

¶23 The Fortners argue in the alternative that, even if a lack of current perennial flow, alone, does not preclude Streambed Act jurisdiction, the stream must have been flowing perennially as of 1975, the year of the Streambed Act's enactment, for jurisdiction to attach to a currently non-perennial stream. The Fortners draw this conclusion from the following discussion in *Bitterroot*:

> When passing the 310 Law [(Streambed Act)], the Legislature recognized man's impact, both past and future, upon the State's waters, requiring that rivers and streams "are to be protected and preserved to be available in their natural, or existing state, and to prohibit unauthorized projects . . . ." Section 2, Chap. 463, L. 1975. The bill's title stated it was for "An Act to provide for a policy of preserving the natural or existing shape, form and course of streams to activities of private persons or organizations . . . ." The 310 Law thus contemplated protection of the "existing shape, form and course" of waters, even if those waters were no longer purely "natural." *The "existing" state of affairs when the 310 Law was passed in 1975 was that the East Fork of the Bitterroot had already been heavily manipulated* in order to convey water to Tucker Headgate, which was then diverting water into the quarter-mile dug channel leading to the Mitchell Slough. Looking ahead to future impacts, the 310 Law required stream "projects"—physical alterations or modifications—to be pre-authorized by a conservation district. Section 75-7-103(5) -111, -112, MCA. The Tucker Headgate is precisely the kind of stream alteration which would be subject to review and approval under the 310 Law.

*Bitterroot*, ¶ 37 (emphasis added, omission in original).

¶24 In context, the passage demonstrates only that the legislative purpose to protect either the natural *or* existing state of affairs—at a time when the majority of Montana's waterways had already been subjected to some form of human modification—informed our central holding in *Bitterroot* that Streambed Act jurisdiction may, under certain

11

circumstances, extend to waterways that are not, strictly speaking, "natural" in origin. The effect of *Bitterroot* was not to replace the Streambed Act's purpose of protecting waterways in their "natural" state with one for protecting only "existing" states; rather, it was to recognize both purposes. Nothing in this passage, or the relevant regulatory or statutory text, suggests that a conservation district may not look to the effect of pre-1975 human activity on a waterway's natural flow characteristics. Therefore, BCD did not err in examining historical evidence when determining whether Montana Gulch, notwithstanding its current intermittent surface flow, would have flowed perennially in the absence of human activity.

¶25    *Issue Three: Whether the Broadwater Conservation District was arbitrary and capricious in finding that, but for human mining activity, Montana Gulch would exhibit perennial surface flow throughout its course.*

¶26    The Fortners argue that, even if BCD's legal standard was correct, BCD's factual finding that Montana Gulch would have flowed perennially in its unaltered state was arbitrary and capricious. They detail evidence in the record, particularly the testimony of their expert, Robin McCulloch (McCulloch), supporting the contention that Montana Gulch's surface flow had likely always been intermittent and that its surface flow is driven underground by natural geology, not mining activity.

¶27    However, the mere presence of evidence in the record that could have supported the Fortners' position is not the relevant inquiry on appeal. *See City of Livingston*, ¶ 10 (district court "may not alter a decision merely because the record contains inconsistent evidence or evidence that might support a different result"). Rather, the Fortners must bear the burden of proving BCD's decision was "random, unreasonable, or seemingly unmotivated

12

based on the existing record" without asking us to substitute our "judgment for that of the agency as to the weight of the evidence." *City of Livingston*, ¶ 10 (quotation omitted); *Bitterroot*, ¶ 18 (quotation omitted).

¶28 The parties do not dispute that Montana Gulch, in its current state, begins as a perennial stream and gains water throughout its course. They also agree that it loses year-round surface flow in its middle and lower sections. Additionally, it is undisputed that Montana Gulch has been altered by mining activity stretching back to the nineteenth century, though the parties disagree as to the extent and significance of these efforts.

¶29 However, evidence presented to BCD regarding Montana Gulch's historic flow was mixed. One sworn statement described regularly finding Montana Gulch with enough flow to water sheep in June and September, dating back to 1965.[3] In contrast, a letter from a former drilling company employee described being unable to find sufficient water to place a pump while conducting drill work in the area in the 1990s while a letter from a former project manager stated "no flowing surface water was present in summer or fall seasons" and that no perennial flow was "observed during the period from 1989 to 1996." The Fortners pointed out that, as far back as 1886, the United States Geologic Survey had classified Montana Gulch as a non-perennial stream.

¶30 Similarly, evidence—primarily in the form of McCulloch's report and subsequent testimony—was mixed on the disputed question of whether human mining activity or

---

[3] The Fortners appear to question the credibility of this affiant by noting his connections with BCD and otherwise challenge the value of his testimony. However, questions of credibility and weighing of evidence are for the factfinder, rather than this Court on appeal, to consider. *See Bitterroot*, ¶ 18.

13

natural geology was responsible for the current lack of year-round surface flow in Montana Gulch. McCulloch's report stated that Montana Gulch is "very likely to have always been an intermittent stream as determined by the geology" and blamed fractured and porous bedrock for allowing water to sink into the ground. However, McCulloch's report went on to state that "surface flows became intermittent largely *because of former mining activity*," noting that the channel had been diverted many years prior. (Emphasis added.)

¶31 McCulloch provided testimony during the hearing where he downplayed the relative significance of mining activity described in his report. However, as the District Court noted, this testimony took place after the legal significance of the impacts of mining activity had been highlighted at the hearing, raising credibility questions.

¶32 McCulloch's report also identified potential mechanisms by which human mining activity could have eliminated Montana Gulch's surface flows. First, the report highlighted the role that Montana Gulch's natural clay layer—which was present in the upper regions but absent further downstream—played in sealing water on the surface. McCulloch's report acknowledged that mining activity had impacted this area and he testified that Tracy Fortner himself "had dug down to bedrock." As the District Court pointed out, it would not have been unreasonable for BCD to conclude that human mining activity had disturbed Montana Gulch's natural clay layer, thereby allowing the water to sink to fractured and porous bedrock below. Similarly, McCulloch's report described how Montana Gulch showed evidence of a mining sequence in which "the water below the [mine] workings flowed through the coarse rock filter *that was created during the operation*" and how the highly porous "valley fill" used as reclamation material absorbed water: "The existing

14

flows are exposed on bedrock but as soon as the valley fill is encountered the water goes underground." (Emphasis added.) Thus, it was reasonable to conclude that the presence of a coarse rock filter and valley fill due to mining activity in Montana Gulch was responsible for the watercourse's journey underground.

¶33 In attempting to determine why Montana Gulch loses year-round surface flow after leaving its headwaters region, despite generally exhibiting increasing flow as it moves downstream, it was within the purview of BCD to assess the credibility of the witnesses and affiants and "reasonably reconcil[e]" the conflicting evidence in reaching a decision. *See City of Livingston,* ¶ 16. Notwithstanding the presence of evidence that could have supported a different conclusion, BCD's determination that human mining activity, rather than natural geology, is responsible for the lack of perennial flow on Montana Gulch is supported by sufficient evidence and the Fortners have not shown that BCD's finding was "random, unreasonable, or seemingly unmotivated based on the existing record." *City of Livingston,* ¶ 16 (quotation omitted). BCD's determination that Montana Gulch would have flowed perennially in its natural state, and is, therefore, under the Streambed Act's jurisdiction, is not arbitrary and capricious.

¶34 *Issue Four: Whether the Broadwater Conservation District and the District Court incorrectly considered groundwater as part of Montana Gulch.*

¶35 The Fortners contend that the District Court and BCD erred in considering groundwater when considering whether Montana Gulch was a "stream" under Streambed Act jurisdiction. BCD found that Montana Gulch, though intermittent in places, increased in flow as it moved downstream, "indicating possible additional groundwater or tributary

15

sources." Though McCulloch's report dismissed the importance of this increasing flow as attributable to a concentration of groundwater, BCD concluded that "[a]ll of these waters must be considered in determining" whether Montana Gulch is a "natural, perennial-flowing stream."

¶36 Similarly, the District Court pointed to the same increase in flow when responding to the contention in McCulloch's report that Montana Gulch lacked sufficient water storage capacity in its headwaters region to have ever supported perennial flows. The District Court concluded that the growing strength of Montana Gulch's flow suggested that other sources, including groundwater and tributaries, could have nourished a perennial flow prior to mining activity, even absent substantial holding capacity at the headwaters.

¶37 We note that nothing in the statutory definition of "stream" appears to explicitly exclude an underground waterway, and that the connection between groundwater sources and associated surface flow can certainly have legal significance. *See* § 75-7-103(6), MCA (defining "stream" as "any natural, perennial-flowing stream or river, its bed, and its immediate banks"); *e.g.*, *Trout Unlimited*, ¶¶ 35-44 (holding that statutory moratorium on processing of water right claims for groundwater that is "immediately or directly connected to surface water" included groundwater drilling that intercepted groundwater flowing into the surface water and that induced surface water infiltration). Moreover, neither BCD nor the District Court concluded that groundwater, alone, constituted a "stream" under the Streambed Act. Rather, they both simply acknowledged the uncontroversial fact that the water of a surface stream often originates as groundwater, as may have been the case in Montana Gulch. BCD did not exceed statutory bounds in finding this supported the

16

conclusion that Montana Gulch's flow was fed by robust sources and therefore capable of flowing perennially, in the absence of human activity driving it underground.

¶38 Finally, the references to groundwater by BCD and the District Court here comport with our holding in *Stalowy*, where we held that the presence of groundwater flowing under a historic streambed was a relevant consideration in finding that a waterway's loss of perennial surface flow was due to human activity and that Streambed Act jurisdiction could attach. *Stalowy*, ¶ 23 ("Given the impact of historic human manipulation . . ., the [conservation] [d]istrict did not err by considering the subsurface flow when making its jurisdictional determination."). The Fortners seek to distinguish *Stalowy* by contending that it is limited to cases where it has already been established that human activity has driven surface flow underground. Even if this seemingly circular argument were true, it is negated by BCD's reasoned determination here that Montana Gulch was indeed driven underground by human activity, as discussed above. Neither BCD nor the District Court erred in considering the relevance of potential groundwater sources along Montana Gulch when determining whether it was classifiable as a "natural, perennial-flowing stream" subject to Streambed Act jurisdiction under § 75-7-103, MCA.

## CONCLUSION

¶39 The District Court and BCD did not err in concluding that a stream that does not currently exhibit perennial flow, but would have in the absence of human manipulation, may be classified as a "natural, perennial-flowing" stream subject to the Streambed Act. Neither did BCD exceed its statutory authority in considering natural flows and human alterations prior to the Streambed Act's enactment in 1975. BCD was not arbitrary and

17

capricious in its factual finding that, but for human mining activity, Montana Gulch would have flowed perennially to this day. Finally, the District Court and BCD did not err in its consideration of subsurface flows in Montana Gulch. BCD's finding of jurisdiction was properly upheld by the District Court.

¶40 Affirmed.

_____
Chief Justice

We Concur:

_____

_____

_____

_____
Justices

Justice Jim Rice, concurring.

¶41 Appellants introduced significant evidence that the middle section of Montana Gulch was intermittent primarily by reason of geology, and not mining activity. However, I agree with the Court's holding that, as a matter of law, "[n]otwithstanding the presence of evidence that could have supported a different conclusion," Opinion, ¶ 33, the applicable standards of appellate review require that we affirm the agency's contrary factual conclusion when it is supported by sufficient evidence, as here.

¶42 I would offer a word about the agency's actions in this proceeding. Although the BCD appointed an examiner to conduct the hearing and make proposed factual determinations, the supervisors personally went on the site visits, sat through the hearing and listened to all witness testimony, and even filed a post-hearing brief with the hearing examiner instructing him, in the words of their own counsel, "how he should interpret the Streambed Act." My advice to the supervisors: stay in your lane. If you determine to appoint a hearing examiner, then let the examiner do the appointed task without interference. If you just can't let it go, then conduct the proceeding yourselves.

/s/ Jim Rice
_____
Justice

19