FILED

12/13/2022

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 22-0142

DA 22-0142

IN THE SUPREME COURT OF THE STATE OF MONTANA

2022 MT 240

HILLCREST NATURAL AREA FOUNDATION, INC.,
JOEL E. GUTHALS, ANN M. GUTHALS, MARC
VISCHER, ELLEN KNIGHT, ROSS WAPLES, and
VIRGINIA WAPLES,

   Petitioners and Appellants,

  v.

MONTANA DEPARTMENT OF ENVIRONMENTAL
QUALITY,

   Respondent and Appellee,

  and

THE CITY OF BILLINGS,

   Respondent, Intervenor,
   and Appellee.

APPEAL FROM: District Court of the Thirteenth Judicial District,
      In and For the County of Yellowstone, Cause No. DV 19-0192
      Honorable Colette B. Davies, Presiding Judge

COUNSEL OF RECORD:

   For Appellants:

      Trent M. Gardner, Kyle W. Nelson, Katherine B. DeLong, Goetz, Geddes
      & Gardner, P.C., Bozeman, Montana

   For Appellee Department of Environmental Quality:

      Nicholas A. Whitaker, Edward Hayes, Department of Environmental
      Quality, Helena, Montana

   For Appellee City of Billings:

      Brianne C. McClafferty, Matthew H. Dolphay, Holland and Hart, LLP,
      Billings, Montana

Submitted on Briefs: October 26, 2022

Decided: December 13, 2022

Filed:

_____
Clerk

Justice Beth Baker delivered the Opinion for the Court.

¶1 Hillcrest Natural Area Foundation, Inc. and several of its individual members appeal the Thirteenth Judicial District Court's decision to affirm the Montana Department of Environmental Quality's (DEQ) issuance of a solid waste management system (SWMS) license to the City of Billings for future expansion of its Regional Landfill. Hillcrest raises three issues on appeal:

1. *Did the District Court err by concluding that DEQ complied with Admin. R. M. 17.50.1005 when it approved the City's license application?*

2. *Did the District Court err when it concluded that DEQ did not need to prepare an EIS pursuant to Admin. R. M.. 17.4.608(1)(g)?*

3. *Did the District Court err by not addressing whether the proposed expansion area violates § 75-10-212(2)(c), MCA?*

Finding adequate support in the District Court record, we conclude that DEQ did not violate the law, that it reasonably interpreted its own regulations, and that it considered relevant factors when it granted the SWMS license. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 In 2015, the City applied to DEQ to amend its existing SWMS license to include the proposed expansion area of its Class II facility, the Billings Regional Landfill. A Class II facility can control the "storage, treatment, recycling, recovery, and/or disposal of Groups II, III, and IV solid wastes." Class II facilities require the strictest and most protective features to protect human health and the environment.

3

¶3 DEQ issued the City's existing SWMS license in 1978 to include 421 acres of City property. The proposed expansion area would increase the City's SWMS license coverage to encompass 350 contiguous acres of City-owned property located just south of the Regional Landfill. The Regional Landfill is located about 2,000 feet south of the Yellowstone River. The City does not anticipate needing the expansion for another forty to seventy-five years and expects to begin construction in twenty to twenty-five years.

¶4 The City identified fourteen wetlands interspersed over the proposed expansion area. Occupying 2.41 acres, these wetlands connect with twenty-two "first-order intermittent streams." The twenty-two first-order streams flow into one "large second-order intermittent stream" located in the center of the proposed expansion area. The second-order stream flows into Blue Creek; Blue Creek connects to the Yellowstone River.

¶5 The City admitted in its application that the construction of "landfill units and associated features of the proposed expansion area would remove the 2.41 acres of existing wetlands identified on site." The City acknowledged that these wetlands and the associated streams "have direct contact to Blue Creek, which flows into the Yellowstone River via the second order drainage." Therefore, the City noted that its proposed expansion area, in addition to DEQ approval, likely also would require a permit from the U.S. Army Corps of Engineers pursuant to Section 404 of the Clean Water Act (CWA) because the Yellowstone River is a designated "traditional navigable water." DEQ approved the City's application and issued it an updated SWMS license, but it conditioned the City's ability to move forward on first obtaining a Section 404 permit from the Corps of Engineers "prior

4

to any wetland disturbance." DEQ also required that the City construct "mitigated wetlands" before expanding to help offset the anticipated loss of the fourteen wetlands.

¶6    Prior to granting the license, DEQ reviewed the City's application under the Montana Environmental Policy Act (MEPA) for potential environmental impacts. DEQ drafted an environmental assessment (EA) and took extended public comment, including a public hearing. Among the public commenters was Hillcrest. Hillcrest owns Hillcrest Natural Area, a park open to the public that lies adjacent to the proposed expansion area. Hillcrest raised concerns regarding the proximity of the proposed expansion area in relation to the Natural Area's hiking trails, commenting that because the landfill operations would be visible from the Natural Area, it would ruin the aesthetic of the hiking trails and violate certain restrictive covenants. DEQ responded to this comment, explaining that no land use restrictions conflicted with the proposed expansion area.

¶7    Hillcrest, along with several of its members, challenged DEQ's approval of the City's application in District Court. The City intervened. The parties filed cross-motions for summary judgment. After hearing oral argument on the matter, the District Court granted summary judgment to DEQ and the City. Hillcrest appeals.

## STANDARDS OF REVIEW

¶8    "We review a district court's grant of summary judgment de novo," applying the criteria set forth in M. R. Civ. P. 56(c). *Upper Mo. Waterkeeper v. Mont. Dep't of Envtl. Quality*, 2019 MT 81, ¶ 12, 395 Mont. 263, 438 P.3d 792.

¶9    "We review an informal agency decision—one not classified as a contested case under the Montana Administrative Procedure Act—to determine whether the decision was

arbitrary, capricious, unlawful, or not supported by substantial evidence." *Upper Mo. Waterkeeper*, ¶ 14 (citing *Clark Fork Coal. v. Mont. Dep't of Envtl. Quality*, 2008 MT 407, ¶ 21, 347 Mont. 197, 197 P.3d 482). Review under this standard "focuses on whether the agency action is (1) unlawful, or (2) arbitrary and capricious." *Upper Mo. Waterkeeper*, ¶ 14 (citing *North Fork Pres. Ass'n v. Dep't of State Lands*, 238 Mont. 451, 459, 778 P.2d 862, 867 (1989)). A decision is not arbitrary or capricious when it relies on "consistent, rational, and well-supported agency decision-making." *Mont. Envtl. Info. Ctr. v. Mont. Dep't of Envtl. Quality*, 2019 MT 213, ¶ 26, 397 Mont. 161, 451 P.3d 493. A well-supported decision is one that considers "relevant data" and can articulate "a satisfactory explanation for. . . action, including a rational connection between the facts found and the choice made." *Clark Fork Coal.*, ¶ 47.

¶10 We discuss additional standards of review as applicable to the separate issues that Hillcrest raises.

**DISCUSSION**

¶11 Hillcrest appeals the District Court's order on three of the challenges it brought in the action. First, Hillcrest argues that DEQ's approval of the City's SWMS license application violated the Solid Waste Management Act's (SWMA) regulations because the City did not submit certain required demonstrations prior to approval. Second, Hillcrest argues that DEQ unreasonably determined that an EIS was not necessary to its environmental impact review in violation of Admin. R. M. 17.4.608(1)(g). Third, Hillcrest argues that the proposed expansion area violates § 75-10-212(2)(c), MCA, and that the

6

District Court erred by not considering this statute when it granted summary judgment to DEQ and the City.

¶12 *Issue One: Did the District Court err by concluding that DEQ complied with Admin. R. M. 17.50.1005 when it approved the City's license application?*

¶13 Under SWMA, DEQ has the authority to regulate the operation, design, and location of SWMSs. Section 75-10-204, MCA. Pursuant to Admin. R. M. 17.50.1005(1): "a lateral expansion of an existing Class II . . . landfill unit, may not be located in wetlands, unless the owner or operator submits to the department for approval [certain specified] demonstrations[.]" Among these demonstrations, Admin. R. M. 17.50.1005(1)(a) and (d) require the applicant to rebut the presumption that a practicable alternative to the proposed location exists that does not endanger wetlands and to show the steps taken by the applicant to mitigate wetland destruction. Admin. R. M. 17.50.1005(1)(a) and (d) are applicable to the extent required by the CWA or "applicable Montana wetlands laws."

¶14 DEQ determined that the 2.41 acres of affected wetlands are under the jurisdiction of the CWA. Based on this determination, DEQ required the City to obtain a Section 404 permit prior to proceeding with construction or any wetland disturbance. DEQ concluded that because obtaining a Section 404 permit requires the City to demonstrate no available practicable alternative to its chosen location and the steps taken to minimize adverse effects on wetlands, conditioning license approval on first obtaining a Section 404 permit satisfied the requirement for demonstrations in Admin. R. M. 7.50.1005.

¶15 We give "great weight" to an agency's understanding of its own rule because agencies possess "specific, technical, and scientific knowledge surpassing that of the

7

[courts]." *Mont. Envtl. Info. Ctr.*, ¶¶ 23, 26. When evaluating an agency's interpretation of its own rule, courts consider whether the agency's interpretation is within the "range of reasonable interpretation." *Clark Fork Coal,* ¶ 20.

¶16 The CWA regulates the discharge of "dredged" or "fill" material into waters of the United States, including wetlands.[1] 33 U.S.C. §§ 1341, 1344. Section 404 of the CWA generally requires a permit when the discharge of such material will impact "navigable waters" of the United States. 33 U.S.C. § 1344(a), (e)(1). Section 404 permits are granted by the Corps of Engineers. 33 U.S.C. § 1344(a), (d). To obtain a Section 404 permit, applicants must demonstrate that there is no "practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." 40 C.F.R. § 230.10(a). Additionally, applicants must demonstrate that they will take the "appropriate" and "practicable" steps necessary to "minimize potential adverse impacts of the discharge on the aquatic ecosystem." 40 C.F.R. § 230.10(d).

¶17 The District Court found that DEQ acted within a "reasonable range" of its own rule when determining that the information provided by the City was sufficient under Admin. R. M. 17.50.1005. The court concluded that because DEQ's regulations are nearly identical to the demonstrations required by the Section 404 permitting process, it was not unreasonable to satisfy the conditions of Admin. R. M. 17.50.1005(1)(d) by requiring the

---

[1] The Supreme Court of the United States heard oral argument October 3, 2022, on whether and how wetlands are subject to the CWA. *See Sackett v. EPA*, 8 F.4th 1075 (9th Cir. 2021, *cert. granted*, Jan. 24, 2022). Though the Court's opinion could impact this case, we decide the matter before us under the extant laws and regulations.

City to obtain a Section 404 permit prior to moving forward. It also found § 75-1-220(1), MCA, applicable, thus limiting the need for DEQ to conduct an alternative analysis under Admin. R. M. 17.50.1005(1)(a). Nonetheless, the court found that the City adequately rebutted the presumption of a practicable alternative that did not involve wetlands "by logically analyzing and rejecting four alternatives on [the] property it has available."

¶18 Hillcrest argues that DEQ impermissibly granted the City's SWMS license application without considering the demonstrations required by Admin. R. M. 17.50.1005(1)(a) and (d). The City provided only alternatives that disturbed wetlands. Hillcrest contends that DEQ should have required the City to present, in its application, an alternative not involving wetlands pursuant to Admin. R. M. 17.50.1005(1)(a). Hillcrest argues further that the general provisions in § 75-1-220, MCA, "must yield" to the specific requirements in Admin. R. M. 17.50.1005 to reconcile a "clear and unavoidable conflict," citing *Kadillak v. Anaconda Co.*, 184 Mont. 127, 136-37, 602 P.2d 147, 153 (1979).

¶19 DEQ and the City argue that the District Court did not err when it concluded that DEQ made a "reasoned determination" that the City satisfied the requirements of Admin. R. M. 17.50.1005. They maintain that DEQ correctly interpreted Admin. R. M. 17.50.1005 when it conditioned the City's ability to move forward with expansion on first obtaining a Section 404 permit.

Hillcrest challenges DEQ's interpretation of its own regulation; the District Court thus properly considered whether DEQ interpreted Admin. R. M. 17.50.1005 within a "reasonable range" of its rule, evaluating whether DEQ had sufficient information to support its decision. *Mont. Envtl. Info. Ctr.*, ¶ 26. On de novo review, we first consider

9

DEQ's compliance with Admin. R. M. 17.50.1005(1)(a). The rule requires an applicant to clearly rebut the presumption that "a practicable alternative to the proposed landfill is available that does not involve wetlands." This demonstration is required "when applicable under" federal laws or Montana wetlands laws. Admin. R. M. 17.50.1005(1)(a). An "alternative analysis" is "an evaluation of different parameters, mitigation measures, or control measures that would accomplish the same objective as those included in the proposed action by the applicant." Section 75-1-220(1), MCA. For "a project that is not . . . state-sponsored . . ." an alternative analysis "does not include an alternative facility or an alternative to the proposed project itself." Section 75-1-220(1), MCA.

¶20 The parties concede that the proposed expansion area is not a state-sponsored project. We thus agree with the District Court that it was reasonable for DEQ to determine, under the plain language of § 75-1-220(1), MCA, that its analysis did not need to include "an alternative facility or an alternative to the proposed project itself." *See Park Cty. Envtl. Council v. Mont. Dep't of Envtl. Quality*, 2020 MT 303, ¶ 50, 402 Mont. 168, 477 P.3d 288.

¶21 Hillcrest wrongly relies on *Kadillak* to argue that Admin R. M. 17.50.1005(1)(a) requires what § 75-1-220(1), MCA, does not. In *Kadillak*, this Court assessed a conflict between MEPA and the Hard Rock Mining Act (HRMA)—both statutes that applied to the agency's permitting process. 184 Mont. at 134-136, 602 P.2d at 152-153. This Court acknowledged the well-settled principle that a specific statute will control a general statute; the 60-day deadline in HRMA controlled because it was a specific statute compared to MEPA's general review requirements. *Kadillak*, 184 Mont. at 137, 602 P.2d at 153. Hillcrest argues that likewise here MEPA's § 75-1-220(1), MCA, should yield to DEQ

10

regulation and a more specific statute under SWMA, § 75-10-221(3), MCA, requiring the City include "information that [DEQ] may by rule require" in its SWMS license application.

¶22 Hillcrest's argument overlooks an important distinction. *Kadillak* does not apply here because there is no conflict between applicable statutes. SWMA does not require an applicant to identify an alternative site that does not involve wetlands; it instead authorizes DEQ to adopt rules requiring "information" about the proposal. *See* § 75-10-221(3), MCA. The rule, Admin. R. M. 17.50.1005(1)(a), requires an applicant, when applicable under Montana law, to rebut the presumption that a "practicable alternative" to the proposed landfill exists that does not involve wetlands. Section 75-1-220(1), MCA, defines "alternatives analysis" and limits what such an analysis includes when a project is not "state-sponsored." The statute and rule do not conflict. If they did, however, the statute would not yield to the rule. An administrative rule that conflicts with statutory requirements or exceeds authority provided by statute is invalid. *Mont. Indep. Living Project v. Mont. Dep't of Transp.*, 2019 MT 298, ¶ 31, 398 Mont. 204, 454 P.3d 1216 (citations omitted). DEQ properly applied its rule to avoid any such conflict.

¶23 The City provided four alternatives for DEQ to review, all within the same 350-acre parcel of land. The City offered only alternatives that also impacted wetlands. It was reasonable for DEQ to understand that the City could not provide an alternative without wetland endangerment because the City was limited in the land it had available. Hillcrest has not established that § 75-1-220(1), MCA, required the City to identify alternative locations outside its available land area in order to show a practicable alternative without

11

wetland endangerment under Admin. R. M. 17.50.1005(1)(a). As the District Court concluded, "the statute limits . . . analysis [of alternatives] to state-sponsored projects before an alternative facility or an alternative to [the] project itself must be considered." Accordingly, DEQ's Final EA "would necessarily not include discussion of an alternative facility that does not involve wetlands." We agree with the District Court that "DEQ was not required to consider an alternative facility or an alternative to the proposed project itself."

¶24 Further, under current federal CWA regulations, the City will be required to demonstrate it has no "practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." 40 C.F.R. § 230.10(a). Given this requirement, DEQ acted within the range of reason when it concluded that conditioning the City's permit on obtaining a Section 404 permit satisfied Admin. R. M. 17.50.1005(1)(a). DEQ's decision that the City satisfied Admin. R. M. 17.50.1005(1)(a) did not unlawfully conflict with Montana statutes nor was it an unreasonable interpretation of the rule.

¶25 Admin. R. M. 17.50.1005(1)(d) requires, to the extent necessary under the CWA, that applicants demonstrate the steps taken to minimize wetland loss. Similar to subsection (1)(a), subsection (1)(d) of the rule requires the applicant to make such a demonstration "to the extent required under . . . Section 404 of the Federal Clean Water Act . . . or applicable Montana wetlands laws." DEQ required that, prior to the start of construction, the City

12

must obtain a federal Section 404 permit and mitigate the anticipated disruption of wetlands.

¶26 "The Section 404 permit process is governed simultaneously by Corps Regulations, 33 C.F.R. Parts 320-29, and by EPA guidelines, 40 C.F.R. Part 230. Both sets of rules must be observed." *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs.*, 524 F.3d 938, 946-47 (9th Cir.), *amended* (2008) (quotation omitted). The National Environmental Policy Act applies to the federal permitting process, obligating the agency to "consider every significant aspect of the environmental impact of a proposed action . . . and inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Bering Strait Citizens*, 524 F.3d at 947.

¶27 Based on the requirements of the Section 404 permitting process, DEQ concluded that, under Admin. R. M. 17.50.1005(1)(d), obtaining a Section 404 permit would demonstrate that the City took steps to minimize the impact to wetlands prior to construction of the proposed expansion area. Specifically, 40 C.F.R. § 230.10(d) requires an applicant to demonstrate that "appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem."

¶28 The District Court record establishes that DEQ conditioned its approval of the SWMS license on the City obtaining a Section 404 permit and mitigating wetlands loss prior to construction. If the Corps of Engineers determines that an alternative to the proposed expansion area does exist that does not impact wetlands, then the City will not be able to move forward. Similarly, if the Corps of Engineers is dissatisfied with the City's plan to mitigate loss of wetlands, then it can deny the Section 404 permit, resulting in denial

13

of the City's proposed expansion area. Considering the relationship between Admin. R. M. 17.50.1005(1)(d) and the CWA, it was not unreasonable for DEQ to determine that approving the SWMS license application subject to these conditions satisfied its own rule. We agree with the District Court "that DEQ had sufficient information to make a reasoned determination to approve the City's application, factoring in each of the required demonstrations, despite the inevitable removal of the wetlands areas on the approved site."

¶29   *Issue Two: Did the District Court err when it concluded that DEQ did not need to prepare an EIS pursuant to Admin. R. M. 17.4.608(1)(g)?*

¶30   Hillcrest raised concerns during public comment regarding "restrictive covenants" related to the Natural Area; it maintains that proceeding with the proposed expansion area would violate restrictions imposed by a "1995 BLM Plan." Hillcrest argues that the Development and Management Plan submitted by the City in 1995 to the U.S. Department of Interior, Bureau of Land Management (BLM) for approval became a formal BLM decision. Therefore, because the DEQ failed to evaluate the Development and Management Plan, this Court must remand to DEQ to prepare an EIS specifically analyzing the Development and Management Plan's conflict with the proposed expansion area.

¶31   In its comments, Hillcrest provided two letters to support its position: a September 1995 letter from the City to BLM and a November 1995 letter from BLM to the City. The September letter referenced the City's pending application for a land patent to use a 17.45-acre parcel as a methane monitoring area for the Regional Landfill. The 17.45-acre parcel is located southwest of the Regional Landfill. The Regional Landfill lies between the 17.45-acre parcel and the proposed expansion area. The City submitted a draft

Development and Management Plan with its land patent application. The September letter

requested that the draft be updated to reflect two amendments:

1.  The City will <u>not</u> extend landfilling operations into the 26.3-acre
    monitoring area, and

2.  The City will design and construct the landfill such that daily operations
    are not visible from the Natural Area.

In the November letter, BLM issued a decision stating that the draft had been amended to

include the September revisions.

¶32    In January 1997, Hillcrest and the City executed a Buy-Sell Agreement. The City

exchanged a 30-acre parcel of city-owned property for the 17.45-acre parcel relevant to the

land patent it sought from BLM in 1995. The Buy-Sell Agreement was altered to include

further restrictions. The Addendum included the following:

1.  The City will not extend landfilling operations into the 17.45-acre parcel.
    The parcel is to be used as a buffer zone where landfill-gas and
    groundwater will be monitored.

2.  The City will design and construct the landfill such that daily operations
    are not visible from the Natural Area.

The Addendum specified that these two restrictions applied to the 17.45-acre parcel.

¶33    In March 1997, BLM authorized title transfer from Hillcrest to the City for the

17.45-acre parcel. BLM issued a land patent to Hillcrest about five months prior for the

lots that the City applied to use as a methane monitoring area in 1995. BLM understood

the purpose of the transfer to be the City's development of a methane monitoring area for

its Regional Landfill.

¶34 DEQ published its Final EA regarding the City's SWMS license application on December 17, 2018. In its visual impacts analysis, DEQ concluded that "no local restrictions . . . prohibit the location of the facility at the site the applicant selected." It also concluded that the proposed expansion area did not "conflict with any local, state, or federal law, requirements, or formal plans."

¶35 The District Court found that the Development and Management Plan at issue qualified as a BLM formal plan. It determined that the DEQ appropriately concluded that any land use restrictions found in the Development and Management Plan or the Buy-Sell Agreement did not apply to the proposed expansion area. The court concluded that DEQ made a "reasoned decision" that any restrictions applied only to the existing Regional Landfill and not to future expansions, and therefore, an EIS was not necessary.

¶36 DEQ and the City argue that DEQ's decision to complete a comprehensive EA in lieu of preparing an EIS was permissible. DEQ argues that Hillcrest mischaracterizes the draft of the Development and Management Plan as a formal BLM plan. DEQ maintains that it nonetheless considered and appropriately determined that the proposed expansion area does not conflict with the Development and Management Plan. DEQ argues that the Development and Management Plan is "specific to the 17.45-acre parcel subject to the BLM land patent." Therefore, BLM's "regulatory jurisdiction is limited to the parcel subject to the land patent." Due to this limitation, the provisions in the Development and Management Plan do not trigger the need for an EIS because they do not apply to the proposed expansion area. Additionally, DEQ argues that whether a conflict exists between

16

the Development and Management Plan and the proposed expansion area is a question it considered and addressed when determining not to require an EIS.

¶37 We review the sufficiency of an agency's environmental review to determine whether the agency acted unlawfully or in an arbitrary and capricious manner. *Bitterrooters for Planning, Inc. v. Mont. Dep't of Envtl. Quality*, 2017 MT 222, ¶ 15, 388 Mont. 453, 401 P.3d 712. Agency actions within permissible statutory bounds are lawful and deserve deference. *Mont. Envtl. Info. Ctr.*, ¶ 22 (citations omitted). If, however, the agency's decisions are incorrect or unlawful, courts need not defer. *Mont. Envtl. Info. Ctr.*, ¶ 22 (citations omitted). We do not reverse an agency decision under the arbitrary and capricious standard unless it was a "clear error of judgment." *North Fork Pres. Ass'n,* 238 Mont. at 465, 778 P.2d at 871. Nor do we substitute a different conclusion in the light of "inconsistent evidence or evidence which might support a different result." *Mont. Wildlife Fed'n v. Mont. Bd. of Oil and Gas Conservation*, 2012 MT 128, ¶ 25, 365 Mont. 232, 280 P.3d 877. When evaluating whether an agency decision was arbitrary or capricious, we consider the "relevant factors" that support the decision; though "searching and careful," the "ultimate standard of review is a narrow one." *Mont. Envtl. Info. Center. v. Mont. Dep't of Transp.*, 2000 MT 5, ¶ 12, 298 Mont. 1, 994 P.2d 676 (citations omitted).

¶38 MEPA requires the preparation of an EIS when "major actions of state government significantly affect[] the quality of the human environment." Section 75-1-201(1)(b)(iv), MCA. Similarly, Admin. R. M. 17.4.607(1)(b) requires the preparation of an EIS "whenever, based on the criteria of ARM 17.4.608, the proposed action is a major action

17

of state government significantly affecting the quality of the human environment." "An impact may be adverse, beneficial, or both. If none of the adverse effects of the impact are significant, an EIS is not required." Admin. R. M. 17.4.608(2). DEQ "shall consider" criteria set forth in Admin. R. M. 17.4.608(1) when determining the "significance" of an impact in evaluating the need for an EIS. One factor is "potential conflict with local, state, or federal laws, requirements or formal plans." Admin. R. M. 17.4.608(1)(g). This regulation does not require an EIS simply because such a plan exists, but only if the impact has "a significant adverse effect[.]" Admin. R. M. 17.4.608(2).

¶39 Hillcrest argues, and DEQ disputes, that the Development and Management Plan used to obtain the land patent for the 17.45-acre parcel is a BLM "formal plan." BLM may convey public lands for public purposes. 43 C.F.R. § 2740.0-3(a). Pursuant to the Recreation and Public Purposes Act, an applicant seeking a BLM land patent or the transfer of title to an existing BLM land patent must include in its application "a detailed plan and schedule for development of the project and a management plan . . . ." 43 C.F.R. § 2741.4(b). BLM enforces compliance with the applicant's submitted plan and may initiate proceedings to revert title back to BLM if the approved development and management plan is not followed. 43 C.F.R. § 2741.9(a)(4). Hillcrest points to the "decision" entered by BLM, found in the November letter to adopt certain amendments to the Development and Management Plan, as proof that the Development and Management Plan is a formal BLM plan. The transactional documents between the City and BLM over a parcel of land separate from the expansion area are not equivalent to a zoning or other land use regulation affecting the City's proposal. DEQ properly concluded that there were

18

no land use restrictions prohibiting the proposed expansion. Nonetheless, to the extent the visibility provision added to the Development and Management Plan could be construed as a local restriction or requirement, the record reflects that DEQ did consider this language as a potential conflict when weighing the need for an EIS in its EA. *See* Admin. R. M. 17.4.608(1)(g).

¶40 MEPA demands that an agency take a "hard look" at the "potential environmental consequences." *Belk v. Mont. Dep't of Envtl. Quality*, 2022 MT 38, ¶ 17, 408 Mont. 1, 504 P.3d 1090 (citation omitted). "Implicit in the requirement [to] . . . take a hard look . . . is the obligation to make an adequate compilation of relevant information, to analyze it reasonably, and to consider all pertinent data." *Clark Fork Coal.*, ¶ 47. This Court does not take its own "hard look" but "requires that the agency do so." *Clark Fork Coal.*, ¶ 47. As a reviewing court, we focus "on the validity and appropriateness of the administrative decision[-]making process without intense scrutiny of the decision itself." *Clark Fork Coal.*, ¶ 47.

¶41 When an agency drafts an EA, the EA "serves as both the initial tool for determining whether a more intensive EIS is necessary and as the mechanism for required environmental review of agency actions that will likely impact the environment but not sufficiently to require an EIS." *Bitterrooters*, ¶ 20; *see* Admin. R. M. 17.4.607(2)(c). The record demonstrates that DEQ considered Hillcrest's concerns and relevant evidence to formulate its conclusion that the Development and Management Plan did not pose a "significant" adverse effect that would warrant an EIS. In its EA, DEQ considered the visual impacts of the proposed expansion area. DEQ reviewed the BLM decision regarding

19

the Development and Management Plan. It also considered the Buy-Sell Agreement between the City and Hillcrest. DEQ noted that the land use restrictions in the Buy-Sell Agreement reflected nearly verbatim the language used in the Development and Management Plan regarding the 17.45-acre parcel for the methane monitoring area.

¶42 An agency's environmental review is meant to evaluate a project's impact on the human environment. Admin. R. M. 17.4.607, 17.4.603(12) defines "human environment" as the "biological, physical, social, economic, cultural, aesthetic factors that interrelate to form the environment." The record reflects that DEQ evaluated the visual impacts of the proposed expansion area on the human environment restriction contained in the Development and Management Plan. In its Final EA, DEQ concluded that the topography of the site and the fact that the landfill would fill a coulee would limit any visual impacts in both extent and duration. It also noted that the tree-and brush-planting measures the City would implement would mitigate most anticipated visual impacts from the project. DEQ further noted that any visual impacts would be minimized over time because, "[u]pon closure, the final landfill cover would appear as low rounded hills that blend into the existing natural surrounding landscape."

¶43 In addition to its analysis in the Final EA, DEQ responded to Hillcrest's comment regarding the Development and Management Plan:

> In January 1997, the City of Billings and the Hillcrest Natural Area Foundation completed a land exchange where 30 acres of City-owned property was exchanged for 17.45 acres of Foundation-owned property. The terms of the exchange prohibit the City from extending landfilling operations into the 17.45-acre parcel. The parcel at issue in that land exchange is separate from the expansion area, and, thus, the prohibition against landfilling activities described by commenters does not apply to the

20

expansion area. The terms also require that [the City] conduct its landfilling activities at the existing landfill in such a manner that daily operations are not visible from the Hillcrest Natural Area.

DEQ followed this assessment with a direct response regarding visual impacts caused by the proposed expansion area:

> According to analysis of potential visual impacts . . . most of the operations will not be visible as the base and slopes of the coulee is [sic] filled with waste. Trees would be planted along the north perimeter of the landfill . . . . These vegetative barriers would be developed prior to commencement of the southern landfill expansion to shield the distant view from homes . . . . The trees would also shield the view of drivers heading south along Hillcrest Road approaching the landfill from the north . . . . The topographic barriers to views of the proposed landfill area would limit the effects on viewshed . . . . In view lines . . . the closed landfill would appear as a small grassy knob rising within and blending into the surrounding largely grassy rangeland. The objective of the Bureau of Land Management (BLM) Visual Resource Management is to manage public lands in a manner which will protect the quality of the scenic values of these lands as required by Federal law. The analysis provided in the final EA . . . meets the same goals.

¶44 It is clear from this record that DEQ did not simply dismiss the Development and Management Plan as inapplicable but considered pertinent information and came to a reasoned decision that its restrictions did not necessitate an EIS. This Court will not overturn an otherwise reasoned agency decision merely because the evidence "might support a different result." *Fortner v. Broadwater Conservation Dist.*, 2021 MT 240, ¶ 9, 405 Mont. 393, 495 P.3d 425 (citations omitted). The record shows that DEQ considered relevant factors and determined that the Development and Management Plan did not present a conflict leading to a significant adverse effect on the quality of the human environment that would compel an EIS. Under our "narrow" standard of review, we conclude that DEQ's decision was not arbitrary or capricious. *See Mont. Wildlife Fed'n*,

21

¶¶ 24-26. We defer to DEQ because this conclusion is not outside statutory parameters and is not a clear error.

¶45    *Issue Three: Did the District Court err by not addressing whether the proposed expansion area violates § 75-10-212(2)(c), MCA?*

¶46    Hillcrest argues that the District Court erred when it did not consider § 75-10-212, MCA, in its order granting summary judgment to DEQ and the City. Section 75-10-212, MCA, provides:

> (1) A person may not dispose of solid waste except as permitted under this part.
> (2) It is unlawful to dump or leave any garbage, dead animal, or other debris or refuse:
>    a. in or upon any highway, road, street, or alley of this state;
>    b. in or upon any public property, highway, street, or alley under the control of the state of Montana or any political subdivision of the state or any officer or agent or department of the state or political subdivision of the state;
>    c. within 200 yards of a public highway, road, street, or alley, or public property;
>    d. on privately owned property where hunting, fishing, or other recreation is permitted; however, this subsection does not apply to the owner, the owner's agents, or those disposing of debris or refuse with the owner's consent.

Hillcrest argues that § 75-10-212(2)(c), MCA, renders the proposed expansion unlawful because it would allow solid waste disposal within 200 yards of a public roadway.

¶47    "The interpretation of a statute is a question of law that we review for correctness." *Clark Fork Coal. v. Tubbs*, 2016 MT 229, ¶ 18, 384 Mont. 503, 380 P.3d 771 (citation omitted). When the understanding of a statute is in doubt, we give "respectful consideration" to the meaning ascribed by the agency when the agency has a "long and continued course of consistent interpretation." *City of Great Falls v. Mont. Dep't of Pub.*

22

*Serv. Regulation*, 2011 MT 144, ¶ 10, 361 Mont. 69, 254 P.3d 595 (citations omitted). "Statutory construction should not lead to absurd results if a reasonable interpretation can avoid it." *City of Missoula v. Fox*, 2019 MT 250, ¶ 18, 397 Mont. 388, 450 P.3d 898 (quotation omitted).

¶48 The statutes governing waste and litter control are found in title 75, chapter 10, part 2 of the MCA. Under § 75-10-221(1), MCA, "a person may not dispose of solid waste or operate a [SWMS] without a license from [DEQ]." No statutes explicitly mandate the instances for which DEQ can or cannot grant an SWMS license. The DEQ must, however, "adopt rules governing [SWMS] . . . ." Section 75-10-204, MCA. DEQ's regulations addressing the operations and locations of landfills subject to licensure under SWMA are found in Admin. R. M. 17.50.1000 through Admin. R. M. 17.50.1118. Admin. R. M. 17.50.1009 specifies restrictions on landfill locations.

¶49 DEQ and the City argue that the plain language of § 75-10-212(1), MCA, reflects that it is an exception to the general prohibitions on dumping found in § 75-10-212(2), MCA, because the two subsections describe "distinct activities." They interpret the language in subsection (1)—prohibiting disposal of "solid waste except as permitted under this part"—to reference the "Licensing of Refuse Disposal and Transportation of SWMA." Subsection (1), Appellees contend, "is aimed at landfills." To support their contention, Appellees point to § 75-10-221(1), MCA, providing that "a person may not dispose of solid waste or operate a[n] [SWMS] without a license from [DEQ]." Appellees argue that this cannot mean that all individuals must obtain a license prior to using a licensed landfill;

subsection (1) therefore must apply to landfills as an exception to subsection (2), which applies to the general public.

¶50 The City posits that "it makes no 'logical' sense" to apply subsection (2) to landfills because the results would be "absurd." The City demonstrates this absurdity with § 75-10-212(2)(b), MCA, which prohibits dumping on public property under control of the State or a political subdivision of the State. The City argues that prohibiting landfills "from operating in all of the locations listed in subsection (2) would produce the absurd result of preventing all municipalities and counties from operating landfills on the land they control." Additionally, DEQ maintains that it has never interpreted § 75-10-212(2)(c), MCA, to apply to landfills granted SWMS licenses and its interpretation should be "respectfully considered by this Court."

¶51 DEQ and the City argue further that the legislative history of § 75-10-212, MCA, supports their understanding of the statute. Prior to incorporation in the MCA, § 75-10-212(1) and (2)(c) originated in separate titles of the Revised Codes of Montana. *See* Dumping garbage or other debris or refuse upon or near highway or public recreational property, § 31-1014 R.C.M. (1947) (*retitled* § 32-4410); Legislative findings and policy, § 69-4001 R.C.M. (1947); License required, § 694004 R.C.M. (1947). Incorporated statutes from the Revised Codes of Montana are construed according to the original intent of the statute. Section 1-11-103(3), MCA. Appellees reason that "[i]t was never the Legislature's intent that subsection (1) and subsection (2) address the same actors or same activities." Therefore, they suggest, legislative history supports reading subsection

24

(1) as excepting landfills from general prohibitions and subsection (2) as applied to the general public.

¶52 We are persuaded by the City's argument regarding the plain language of § 75-10-212, MCA. The statute makes clear that subsection (1) and subsection (2) reference distinct activities. Section 75-10-212(1), MCA, provides that, unless "permitted under this part," a person may not dispose of solid waste in a manner prohibited by subsection (2). The exception does not say "permitted under this section." We evaluate a statute's plain meaning "in context of the statute as a whole, and in furtherance of the manifest purpose of the statutory provision and the larger statutory scheme in which it is included." *Clark Fork Coal. v. Mont. Dep't of Natural Res. & Conservation*, 2021 MT 44, ¶ 36, 403 Mont. 225, 481 P.3d 198. Therefore, the entirety of the statutory part must be considered when evaluating how solid waste may be disposed. *See Eldorado Coop. Canal Co. v. Hoge*, 2016 MT 145, ¶ 18, 383 Mont. 523, 373 P.3d 836.

¶53 Giving effect to subsection (1) for permitted activity, § 75-10-212, MCA, clarifies that landfills may operate when and where licensed by DEQ, notwithstanding the statute's general prohibited disposal of garbage in the listed locations. When granting licenses, DEQ shall "adopt rules governing solid waste management systems . . . ." Section 75-10-204, MCA. DEQ has not adopted a rule prohibiting licensed SWMS facilities from operating within 200 yards of a public roadway. Further, § 75-10-212(2)(b), MCA, prohibits persons from dumping "in or upon public property." Unless read to consider landfills as an exception under subsection (1), this statute would create an absurd scheme under which

25

landfills could not exist on government-owned land. *See City of Missoula*, ¶ 18 (this Court avoids statutory interpretations that foster absurd results).

¶54 Considering the plain language of § 75-10-212, MCA, and the surrounding statutes and regulations that require DEQ to set licensing parameters for solid waste disposal, DEQ's interpretation of § 75-10-212, MCA, is not unreasonable. We conclude that DEQ did not act unlawfully under § 75-10-212, MCA, when it granted the City's license.

**CONCLUSION**

¶55 We affirm the District Court's decision to uphold DEQ's approval of the City's SWMS license application.

/S/ BETH BAKER

We Concur:

/S/ LAURIE McKINNON
/S/ JIM RICE
/S/ JAMES JEREMIAH SHEA
/S/ DIRK M. SANDEFUR